## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**LUIS MUNUZURI HARRIS,**

      **Petitioner,**

**v.**                                                    **Case No. 8:16-cv-3199-MSS-CPT**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**
_____/

## O R D E R

This cause is before the Court on Luis Munuzuri Harris's timely-filed *pro se* amended petition for the writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 43) Having considered the petition, the response (Doc. 65), the reply (Doc. 67), and the supplemental response (Doc. 78),[1] and in accordance with the *Rules Governing Section 2254 Cases in the United States District Courts*, it is **ORDERED** that the petition is **DENIED**:

## PROCEDURAL BACKGROUND

The State of Florida charged Harris with sexual battery (count one), kidnapping with the intent to commit sexual battery (count two), falsely impersonating an officer (count three),[2] fraudulent use of personal information (count four), fraudulent use of

---

[1] Harris elected not to reply to the supplemental response. (Doc. 82 at 1-2)

[2] The state court record uses the term "personating", rather than "impersonating."

1

a credit card (count five), and grand theft (count six). (Doc. 30 Ex. 1) The jury convicted Harris as charged on all counts. (Doc. 30 Ex. 3) The trial court dismissed the conviction for count six. (Doc. 30 Ex. 4) The trial court sentenced Harris to concurrent terms of 15 years in prison as a prison releasee reoffender on count one, and life in prison as a prison releasee reoffender on count two. (Doc. 30 Ex. 4) The trial court also sentenced Harris to terms of five years in prison on counts three, four, and five; the five-year terms were concurrent to one another but consecutive to the terms imposed on counts one and two. (Doc. 30 Ex. 4) The state appellate court *per curiam* affirmed the convictions and sentences. (Doc. 30 Ex. 9) Harris filed a state habeas petition and an amended petition alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141, which the state appellate court denied. (Doc. 30 Exs. 25-28) Harris's second state habeas petition under Rule 9.141 was dismissed as successive. (Doc. 30 Exs. 36 and 37)

Harris also unsuccessfully sought postconviction relief under Florida Rule of Criminal Procedure 3.850. His first postconviction motion was stricken with leave to amend. (Doc. 30 Exs. 11, 12) Harris filed an amended motion, as well as an "expanded" version of several claims, a complaint for writ of habeas corpus, several amendments to specific pages of the amended motion, a motion for hearing, and a letter to the state court. (Doc. 30 Exs. 13, 14, 16-20) The state court entered a final

order summarily denying postconviction relief. (Doc. 30 Ex. 21) The state appellate court per curiam affirmed the denial of relief. (Doc. 30 Ex. 24)[3]

## FACTUAL BACKGROUND; TRIAL TESTIMONY[4]

### I.     The State's Evidence

J.A., a 28-year-old woman, lived in Tampa with her uncle. At approximately 10:00 p.m. on July 29, 2010, she left her uncle's house to go to work. As she drove on Bayshore Boulevard, J.A. saw a flickering blue light through the window. A car driven by Harris pulled up next to the driver's side of J.A.'s car, and Harris indicated to her to pull over. When J.A. did so, Harris pulled up behind her. Harris walked to J.A.'s driver's side window. Harris told J.A. that he was an undercover narcotics officer, that J.A. had been swerving in the road, and that he was taking her to jail for DUI. J.A. moved her vehicle to a nearby parking area.

When J.A. exited her vehicle, Harris handcuffed her behind her back. Harris took J.A.'s laptop and purse and placed them in his car. Harris put J.A. in the backseat

---

[3] Respondent agrees that the state court did not rule on Harris's second supplement to his Rule 3.850 motion, filed prior to the final order denying relief. (*See* Doc. 30 Ex. 29 Attachment) The second supplement to Harris's Rule 3.850 motion is relevant to the claims raised in Ground Five, Sub-Claim Four and Ground Six, Sub-Claim Four of the § 2254 petition. It appears that the state court overlooked this supplemental pleading because the court did not mention it in its lengthy, detailed final order. The Court therefore reviews these claims *de novo*. When a state court addresses some claims raised by a defendant, but not a claim that is later raised in a federal habeas proceeding, the federal habeas court will presume that the state court denied the claim on the merits. *See Johnson v. Williams*, 568 U.S. 289 (2013). The presumption is rebuttable, and *de novo* review of such a claim is appropriate when the evidence clearly leads to the conclusion that the state court inadvertently overlooked the claim. *See id*. at 303.

[4] The factual summary is based on the trial transcript and appellate briefs.

of his car. J.A. asked Harris to call her uncle and her place of employment and gave Harris the phone numbers to call. She could not hear Harris talking on the phone because he was outside of the vehicle while he made calls. J.A.'s uncle received a phone call from a person who said he was from the Tampa Police Department and had pulled J.A. over for reckless driving. J.A.'s co-worker Munsif Sharkasi received a phone call informing him of an emergency involving J.A.

Harris began driving his car with J.A. in the backseat. J.A. noticed that Harris seemed to be lost and began wondering whether he was actually a police officer. J.A. sat as calmly as possible, not making any sudden movements. Harris told J.A. that he was going to let her go to an ATM and withdraw money so that she could post a bond when they got to jail, even though he could be fired for doing so.

They went to a Wachovia bank. Harris got J.A.'s ATM card out of her wallet and asked J.A. for her PIN. J.A. told him the PIN. She decided to cooperate because she did not know who he was. When Harris walked up to the ATM, J.A. tried to open the car door with her body but was unable to do so. Harris returned to the car and told J.A. that he was only able to withdraw $300. He continued driving to try to find another bank. He repeatedly told J.A. not to tell anyone what he was doing or he could get fired.

They stopped at a second ATM, where Harris was unable to withdraw any money using J.A.'s card. Afterwards, Harris continued to drive around, and told J.A. that he was going to let her go home. They returned to the parking lot where her vehicle was located. Harris climbed over the center console and into the back seat. Harris

removed J.A.'s clothing, saying that she could not tell anyone. J.A. was crying; she did not give Harris consent to touch her, but she cooperated with Harris because she did not know if he would kill her.

Harris sexually assaulted J.A. She was crying and said she needed to go home. After about five or ten minutes, Harris told J.A. that he was going to let her go home. Harris removed the handcuffs from J.A. She grabbed her laptop and purse and got out of his car. Harris told her that he was going to follow her home and when she got home safely, he would return her wallet to her. J.A. began driving, but she did not see Harris behind her. She returned home at approximately 1:00 to 1:30 a.m. on July 30, 2010. J.A. told her uncle that she needed to call the police. When police arrived, she told them what happened. While she was talking to a detective, J.A. looked at her bank account statement online and saw transactions she did not recognize. One of the transactions was made at the Hard Rock casino, but J.A. had not been there with Harris. A nurse examined and interviewed J.A.; the nurse concluded that she had injuries consistent with forcible sexual assault. When J.A. later saw a picture of Harris on the news after he had been developed as a suspect, she identified him to police.

Police found Harris's abandoned vehicle on July 31, 2010. Inside the car was a wallet containing some of J.A.'s belongings, including J.A.'s driver's license. Harris was apprehended in Tampa later on July 31, 2010. He proceeded to trial on January 10, 2011.

Harris's friend, Michael Sexton, testified at trial that he and Harris went out together earlier the evening of the assault in Harris's car. Sexton described the car as a

silver Chevrolet Impala with tint. Harris told Sexton that he bought the car because it looked like an undercover police car. Harris also pulled up close behind another car and activated some sort of lights; the other car pulled over but Harris drove past. Harris dropped Sexton off close to 10:00 p.m. Sexton saw Harris again the next day. Harris told Sexton that he had been at the Hard Rock the night before and had found a woman's purse. Harris said that he kept the wallet but threw the purse away. Sexton recalled seeing a woman's ID in the car.

After Harris was arrested, he gave a statement to police. Harris denied knowing J.A. when he saw her picture. Then he told police that her car's blinkers were on and she was swerving before hitting a curb, so he stopped to see if she was all right. Harris told police that they decided to "hang out" and went to a bar. Harris told police that he used his own card at the ATM when he ran out of cash and also got money for J.A. using her card. After that, he told police, they went to the Hard Rock together, but they both decided to go home. Harris told police that they went to her car and he told J.A. he would follow her home. Harris said that J.A. started kissing him, and that they had consensual sex, but that he did not rape her.

## II.  Harris's Evidence

Harris testified at trial. He testified that shortly before he dropped off Sexton the night of the assault, they stopped at a gas station, where Harris said hello to a woman he saw. Harris dropped Sexton off at approximately 10:00 p.m. A short time later, Harris observed a car on Bayshore Boulevard hit the curb and come to a stop. Harris pulled next to the car and then pulled in front of it. He got out and yelled at the driver

6

to see if she was all right. They both pulled onto a side street. When the driver of the other car got out, Harris realized it was the woman he had seen at the gas station, J.A. She told him that she was out "cruising" and just trying to get out of the house. Harris and J.A. decided to hang out and went to a nearby bar. They left the bar and went to the Hard Rock casino. However, Harris, testified, they left the casino a short time later.

Harris testified that he took J.A. back to her car. They talked in his car and then "one thing led to another" and they moved into the back seat and had sex. Harris said that afterwards, they exchanged numbers and he followed her home. Harris said that he returned to the casino. He conceded that he used J.A.'s bank card without her permission to buy gasoline and gamble. However, Harris denied locking J.A. in his car and maintained that the sex was consensual. He further denied holding himself out as a law enforcement officer, utilizing any sort of lights in his car, or using handcuffs.

## HARRIS'S REPRESENTATION AT TRIAL

The Office of the Public Defender was appointed to represent Harris. Assistant Public Defenders Maria Pavlidis and Charles Traina were assigned to Harris's case. Trial was set for January 2011 before state Circuit Court Judge Chet A. Tharpe. At a court proceeding on December 21, 2010, Harris told the trial court that he was concerned that his attorneys were not communicating with him sufficiently and were not providing him with all information and discovery in their possession. (Doc. 78-4 Ex. 21 Part 2 December 21, 2010 transcript at 4-10) Pavlidis detailed the visits that she and her investigator made to Harris in the jail, as well as the information she had provided to Harris. (Doc. 78-4 Ex. 21 Part 2 December 21, 2010 transcript at 10-14)

The trial court noted that it appeared counsel had provided Harris all information in counsels' possession, and that the court was "not in a position to find" that Harris's attorneys were ineffective. (Doc. 78-4 Ex. 21 Part 2 December 21, 2010 transcript at 24, 29) At this proceeding, counsel indicated that they were trying to conclude preparations to proceed to trial as scheduled, as Harris did not want to waive speedy trial. (Doc. 78-4 Ex. 21 Part 2 December 21, 2010 transcript at 26-29) However, counsel stated that there might be insufficient time remaining to fully prepare to conduct the trial as scheduled. (Doc. 78-4 Ex. 21 Part 2 December 21, 2010 transcript at 28-29)

At a January 4, 2011, pretrial conference, counsel informed the trial court that counsel had prepared a motion for a continuance but that Harris did not wish to waive his right to a speedy trial and wanted to represent himself at the trial. (Doc. 30 Ex. 44 at 3-5) Counsel explained that video footage and many voluminous depositions had just been received. (Doc. 30 Ex. 44 at 3-5) Counsel further explained that they wanted to investigate DNA evidence and needed time to review depositions to prepare motions in limine. (Doc. 30 Ex. 44 at 3-5)

The trial court conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975)[5] and found that Harris was competent to waive counsel, and that Harris's waiver was knowing, intelligent, and voluntary. (Doc. 30 Ex. 44 at 12-35) Harris acknowledged that his attorneys were seeking a continuance to develop defenses,

---

[5] As stated in *Faretta*, the Sixth Amendment guarantees a defendant in a state criminal trial an independent constitutional right to self-representation. 422 U.S. at 819-20.

which would involve reviewing depositions and investigating DNA evidence. (Doc. 30 Ex. 44 at 12-14) The trial court also informed Harris that if Harris started the trial *pro se* but decided he was not prepared and wanted counsel reappointed, counsel might file a motion for a mistrial to give counsel adequate time to prepare. (Doc. 30 Ex. 44 at 9) The trial court advised Harris that if that happened, Harris "would be in the same situation that you are in right now." (Doc. 30 Ex. 44 at 9)

The trial court discharged the Office of the Public Defender but granted Harris's request to reappoint the Office of the Public Defender as standby counsel. (Doc. 30 Ex. 44 at 35) When the trial court asked Harris if he wanted standby counsel, Harris replied (Doc. 30 Ex 44 at 30):

> Actually, yes, that would be one of my requests. Just out of an abundance of caution, I intend to not waste the Court's - - I don't want to play with this issue. So I intend to take the trial from the beginning to the end. And if Ms. Pavlidis could be allowed to be standby counsel for purposes of courtroom procedures and courtroom etiquette, I think would be beneficial to the trial moving along day-to-day.

Harris again specifically asked for Pavlidis to serve as standby counsel, and she stated that she would assume the position of standby counsel. (Doc. 30 Ex. 44 at 37)

However, the Office of the Public Defender removed Pavlidis from the case. (Doc. 30 Ex. 2 Vol. I at 6) Instead, Traina, along with Assistant Public Defender Mike Peacock, appeared as standby counsel for a motion hearing on January 10, 2011, immediately prior to the start of trial. The trial court explained to Harris that the court had appointed the Office of the Public Defender, and that the decision as to which assistant attorney to assign was at the discretion of the Office of the Public Defender.

9

(Doc. 30 Ex. 2 Vol. I at 6-7) Harris maintained that Pavlidis would be the attorney best suited to serve as standby counsel because of her knowledge of his case and contended that Traina had improperly and deliberately removed Pavlidis from the case. (Doc. 30 Ex. 2 Vol. I at 6-8)

After the motion hearing concluded, and prior to jury selection, Harris contended that Traina's "hostility or indifference" was affecting the standby representation, and that he was not able to adequately communicate with either of his standby attorneys. (Doc. 30 Ex. 2 Vol. I at 33) At Harris's request, the trial court removed the Office of the Public Defender and appointed the Office of Regional Conflict Counsel as standby counsel. (Doc. 30 Ex. 2 Vol. I at 33)

With attorney Christopher Boldt from the Office of Regional Conflict Counsel as standby, Harris represented himself on the first three days of trial. That period encompassed jury selection, opening statements, and testimony from the State's first nine witnesses. On the third day of trial, however, Harris decided that he wanted counsel to represent him. (Doc. 30 Ex. 2 Vol. V at 605-06) Harris stated, "I'm not prepared to argue FDLE scientific things, nor was I prepared to argue the medical aspect of it." (Doc. 30 Ex. 2 Vol. V at 606)

The trial court told Harris that if an attorney was appointed, "that doesn't mean . . . that I'm going to allow a continuance of the trial. You may - - I may appoint an attorney to represent you and rather than declare a mistrial, I may require the attorney to proceed with your defense and we continue on." (Doc. 30 Ex. 2 Vol. V at 606-08)

10

The trial court appointed the Office of Regional Conflict Counsel to serve as Harris's counsel. (Doc. 30 Ex. 2 Vol. V at 608-09)

Attorney Boldt from the Office of Regional Conflict Counsel immediately moved for a mistrial, sought to waive speedy trial, and sought additional time to prepare a defense. (Doc. 30 Ex. 2 Vol. V at 610) The trial court expressed concerns with granting a mistrial (Doc. 30 Ex. 2 Vol. V at 611-12):

> Quite frankly, I anticipated this taking place. And although as the attorney of record now, Mr. Boldt, you have every right to waive Mr. Harris' right to a speedy trial and continue this matter, my concern at this juncture is that if I grant that motion for a mistrial out of manifest necessity, that we are going to unduly cause this victim to have to come back into court and relive the experiences that she has already testified to.
> . . .
>
> Mr. Harris has complained about [Pavlidis and Traina] from the very beginning. He has complained throughout their entire representation of Mr. Harris that they were not doing what he expected them to do, that they were not providing him information that he wanted. And after a hearing and listening to Mr. Traina and Ms. Pavlidis, it's clear to this Court as one of the reasons why I made the finding that the complaints that Mr. Harris was making about Mr. Traina and Ms. Pavlidis, those complaints were baseless. There were no merits of his complaints against those two attorneys.
>
> They had worked diligently from the very beginning in preparation of Mr. Harris' defense.
> . . .
>
> Things may not be going as favorably as Mr. Harris would like. That may be why he has made accusations not only towards Mr. Traina and Ms. Pavlidis but towards the prosecutors and this Court as well. . . . But I have to take into consideration at least at this juncture of the proceedings not only your request to become prepared to present an adequate defense to Mr. Harris, but I also have to take into consideration the interest of the victim in this case.

All of this could have been avoided if Mr. Harris would have cooperated with his attorneys from the very beginning. And now that we have gone through two and a half days of trial, including jury selection, after this Court has gone through an exhaustive *Faretta* hearing with Mr. Harris and after this court has continually advised Mr. Harris of his right to a lawyer, now he asks for one, and now you are appointed, and I have to make the decision as to whether it's in the best interest of - - well, I don't think that - - I don't think the terminology best interest is the proper wording but - - [ ] I want to be honest with you, Mr. Boldt. I think that - - I think I could grant a mistrial and I think that I could base that mistrial on manifest necessity that Mr. Harris' rights to fair trial, his due process rights, he has a right to prepare an adequate defense. But I also think that I have the right to deny that request and cause this trial to go forward because of the harm that it may cause the victim in this case. Given the fact that we are in this posture because of Mr. Harris' actions and Mr. Harris' actions alone, it is no one else's fault but his own.

Harris then claimed that Boldt could not possibly be prepared to proceed with the trial beginning the next day. (Doc. 30 Ex. 2 Vol. V at 631) The trial court asked Harris if he was requesting that the Office of the Public Defender be reappointed. Harris stated (Doc. 30 Ex. 2 Vol. V at 632):

They certainly have a six month head start on the case rather than Mr. Boldt, the two attorneys that represented me. There was no conflict between us. There was an issue about whether or not my speedy trial should be waived, but there was no specific conflict certified. There was a personality disagreement that took place probably 48 hours before Monday that should not have taken place which affected my judgment, probably more severe than it should have.

I have no problems or objections or any conflict regarding [the Assistant Public Defenders] as far as their legal expertise and being able to litigate the trial. The issue was a waiver or not of my speedy trial, constitutional rights.

I fully understand and realize what the magnitude of what they were asking to do last Tuesday with regards to the waiver of speedy trial issue. And that was a tremendous error in judgment on my part, and I should have listened to Mr. Traina's advice, and I should have allowed Ms.

Pavlidis to seek that continuance on Tuesday. And all I can say to the Court is that was a tremendous error in judgment on my part.

The next day, state Circuit Court Judge William Fuente conducted a hearing to address whether any potential conflict would arise if the Office of the Public Defender were reappointed. Judge Fuente stated that the purpose "is simply to conduct a hearing with the agreement of everyone concerned, including . . . Judge Tharpe, to simply make some findings to determine whether there, in fact, would be a conflict with [the Office of the Public Defender] representing the defendant". (Doc. 30 Ex. 46 at 6)

At that hearing, Harris expressed his desire to have the Office of the Public Defender, and specifically Assistant Public Defender Pavlidis, reappointed. (Doc. 30 Ex. 46 at 6-9, 14-18, 23-43) Harris expressed his satisfaction with the Office of the Public Defender and stated that their only disagreement was the waiver of speedy trial, which was now a "moot issue." (Doc. 30 Ex. 46 at 30-44, 48-58) Harris acknowledged that he understood why the Assistant Public Defenders wanted to waive his right to speedy trial and also waived his right to seek postconviction relief regarding any claims of what counsel did or should have done from the original appointment of counsel up until the date of the hearing. (Doc. 30 Ex. 46 at 34, 36-38)

Harris believed that exculpatory OnStar records from his vehicle existed; however, he stated that he understood that Judge Tharpe had ruled that an out-of-state representative from OnStar would not be able to testify at the trial. (Doc. 30 Ex. 46 at 39) Harris also expressed his understanding that although while proceeding *pro se* he had subpoenaed both Pavlidis and an investigator to provide testimony regarding the

OnStar records, if the Office of the Public Defender was reappointed, he would not be able to call Pavlidis and might not be able to call the investigator. (Doc. 30 Ex. 46 at 39-41)

Judge Fuente confirmed with Harris that he was waiving his right to seek postconviction relief about such matters should the Office of the Public Defender be reappointed. Harris stated that he was "absolutely certain" that he did not foresee any conflict with the Office of the Public Defender "based upon anything that's happened up to this point now" and acknowledged that he was waiving "filing a lawsuit or bar grievance, a post-conviction relief [motion] based upon anything that the Public Defender's Office" did prior to being discharged when Harris proceeded *pro se.* (Doc. 30 Ex. 46 at 55-56) Judge Fuente concluded that "there would be no conflict that would exist today with respect to the Public Defender's Office representing the defendant regardless of what happens from this point forward." (Doc. 30 Ex. 46 at 59-60)

Later that day, proceedings were held before the trial judge, Judge Tharpe. He asked Harris: "Mr. Harris, is it your request that this Court discharge Mr. Boldt and appoint the Office of the Public Defender to represent you?" to which Harris replied, "That is correct, Judge." (Doc. 30 Ex. 2 Vol. V at 636) Accordingly, the trial court discharged the Office of Regional Conflict Counsel and reappointed the Office of the Public Defender to represent Harris. (Doc. 30 Ex. 2 Vol. V at 636-38)

Assistant Public Defenders Pavlidis and Traina were again assigned to the case. They sought a mistrial based on necessity because they needed additional time to

prepare a defense. The state trial court denied the motion for mistrial. (Doc. 30 Ex. 2 Vol. V at 705-09) Counsel then moved to recess the trial until the following week. The trial court agreed to recess the trial on Thursday, January 13, 2011, to resume on Tuesday, January 18, 2011. (Doc. 30 Ex. 2 Vol. V at 711-17) The Office of the Public Defender represented Harris throughout the remainder of trial and at sentencing.

<u>STANDARDS OF REVIEW</u>

## I.     The AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law

"if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the judgment and sentence, as well as the denial of Harris's postconviction claims, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

16

## II.   Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Harris must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Harris must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). To establish a claim of ineffective assistance of appellate counsel, Harris must show that appellate counsel's performance was objectively unreasonable,

and that there is a reasonable probability that, but for this performance, he would have prevailed on his appeal. *Robbins*, 528 U.S. at 285-86.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## EXHAUSTION OF STATE REMEDIES; PROCEDURAL DEFAULT

A § 2254 petitioner must exhaust his federal claims in state court before presenting them in a federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal

nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001).

A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.* To establish actual innocence, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995).

## DISCUSSION

### I.      Ground One

A.   **Sub-Claim One: Trial Court Error in Allowing the Jury to Obtain Transcripts**

Harris contends that the trial court violated his federal due process rights by allowing the jury to obtain trial transcripts during deliberations. As addressed, when the Office of the Public Defender was reappointed to represent Harris during the trial, the state trial court granted a recess of several days to give counsel time to prepare for the remainder of trial. It appears that, to facilitate those preparations, the court reporter transcribed the testimony of at least some of the witnesses who had testified.[6]

During deliberations, the jury requested a transcript of the testimony of the victim, the victim's uncle, and the victim's co-worker, Munsif Sharkasi, who all testified before the recess. The judge read the request to the parties and stated that he intended to grant it due to the length of the trial and the availability of the transcripts (Doc. 30 Ex. 2 Vol. VIII at 1185-86):

> THE COURT: All right. Let's go on the record. Question: Is jury entitled to written transcript of witness' testimony? If so, we would like witness 1, J.A.'s testimony, start to finish; witness 2, [the victim's uncle]; witness 3, Munsif Sharkasi. Time of testimony to deliberations is long enough that transcripts would help clarify some points.
>
> Typically, the Court tells jurors that they have to rely on their own memory. This is somewhat different because the trial has taken so long and those transcripts have already been prepared. It will take about 10 to 15 minutes to get the transcripts here. So I am going to have those transcripts brought down of those witnesses and we're going to allow the jury to read the testimony.

---

[6] Upon reappointment, counsel from the Office of the Public Defender explained that attorneys from that Office were not in the courtroom during the earlier portions of the trial and did not know what testimony was given. (Doc. 30 Ex. 2 Vol. V at 655-56)

Counsel initially indicated that Harris did not object to providing the transcripts, but later objected and stated, "we would like for the instruction to be from Your Honor to the jury to rely on their memory of the testimony as it was, as they remember it." (Doc. 30 Ex. 2 Vol. VIII at 1186)

The jury sent another note to the court asking for transcripts of two other State witnesses, Detective Lela Davis (who assisted in the investigation) and Nurse Kristi Stovall (who examined J.A.). (Doc. 30 Ex. 36 at 148) The trial transcript is silent as to whether the court addressed the note or whether the jury received those additional transcripts. (Doc. 30 Ex. 2 Vol. VIII at 1185-92) Harris claims that the jury did in fact receive the transcripts of the other witnesses' testimony.

Harris claims that the trial court violated his federal due process rights by allowing the jury to receive the transcripts during deliberations. Respondent correctly contends that the claim is unexhausted because Harris did not present its federal nature to the state court. When Harris asserted on direct appeal that the trial court erred in allowing the jury to obtain the transcripts, he did not assert that the trial court violated any of his federal constitutional rights. (Doc. 30 Ex. 6 at 28-38) Harris's appellate brief cited one federal decision, *Fuller v. United States*, 873 A.2d 1108 (D.C. 2005), for the general proposition that permitting transcripts during deliberations may run the risk that the jury will give undue weight to the transcribed testimony. (Doc. 30 Ex. 6 at 32-33) As addressed, however, Harris did not mention the United States Constitution, and made no claim that the state trial court violated his federal constitutional rights.

21

Accordingly, Harris's citation to *Fuller* failed to notify the state appellate court that Harris intended to raise a federal due process claim. A claim is not fairly presented if the state court "must read beyond a petition or a brief . . . that does not alert it to the presence of a federal claim." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *see also Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1352 (11th Cir. 2012) ("In other words, 'to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'" (quoting *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007))); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458, 460  (11th Cir. 2015) (finding that *Baldwin* and *Lucas* "stand for the proposition that a petitioner with a claim that could arise under either state or federal law must clearly indicate to the state courts that he intends to bring a federal claim" and stating that "simply mentioning a phrase common to both state and federal law" does not suffice to fairly present a federal claim for purposes of exhaustion); *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (stating that "[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record."); *Kelley v. Sec'y, Dep't of Corr.*, 337 F.3d 1317, 1344 (11th Cir. 2004) (stating that to satisfy the exhaustion requirement, a petitioner must make his claims in a manner that provides the state courts with "the opportunity to apply controlling legal principles to the facts bearing upon" the asserted federal claim). *Cf. Ramos v. Sec'y, Fla. Dep't of Corr.*, 441 F. App'x 689, 697 (11th Cir. 2011)[7] ("In *McNair*,

---

[7] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

we found that a citation to a single federal case in a string of cases, and a passing reference in the conclusion of an argument to various amendments of the Constitution did not fairly present the federal issue to the state court, barring federal habeas review for lack of exhaustion in the state courts.").

Harris's brief failed to alert the state appellate court that he intended to raise a federal due process claim in that court. Instead, the gravamen of his claim was that the trial court's decision was contrary to Florida Rule of Criminal Procedure Rule 3.400(a).[8] Accordingly, Harris's federal due process claim is unexhausted. Harris cannot return to state court to present the claim because state procedural rules do not provide for successive appeals. *See* Fla. R. App. P. 9.140(b)(3) (providing that a notice of appeal must be filed within 30 days of the rendition of the sentence). Harris's federal claim is therefore procedurally defaulted, and he fails to show the applicability of an exception to overcome the default. *See Smith*, 256 F.3d at 1138.

Alternatively, even assuming that the citation to *Fuller* in Harris's brief was sufficient to raise a federal claim, Harris cannot obtain federal habeas relief. The phrase "clearly established federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S.

---

[8] Florida Rule of Criminal Procedure Rule 3.400(a) states:

> The court may permit the jury, upon retiring for deliberation, to take to the jury room: (1) a copy of the charges against the defendant; (2) forms of verdict approved by the court, after being first submitted to counsel; (3) all things received in evidence other than depositions.

at 412. Thus, *Fuller*, a decision of the District of Columbia Circuit Court of Appeals, is not clearly established federal law for purposes of review under the AEDPA. Harris has not identified any United States Supreme Court decision holding that a trial court violates a criminal defendant's federal due process rights by allowing the jury to obtain transcripts of witnesses' trial testimony, and he has identified no United States Supreme Court decision reaching such a conclusion under facts like the unique circumstances of Harris's case. *See, e.g.*, *Williams*, 529 U.S. at 412-13 (stating that a state court's decision is "contrary to" clearly established federal law when it decides a case differently than the Supreme Court has "on a set of materially indistinguishable facts."). Harris fails to meet his burden of showing that the state appellate court's rejection of his claim alleging a federal due process violation was contrary to, or involved an unreasonable application of, clearly established federal law as he must to obtain federal habeas relief. *See* 28 U.S.C. § 2254(d)(1).

Harris also argued in his postconviction "Complaint for Writ of Habeas Corpus" that the trial court erred in giving the transcripts to the jury. (Doc. 30 Ex. 16 at 6-8) However, he again failed to exhaust the federal nature of the claim. Harris did not cite the federal constitution or allege a violation of his federal constitutional rights in arguing that the transcripts should not have been provided. (Doc. 30 Ex. 16 at 6-8) Harris's references to "due process" and a "fair trial" were insufficient to alert the state court to a federal claim. *See Preston*, 785 F.3d at 458, 460.

Alternatively, even if the trial court error claim as presented in the postconviction "Complaint for Writ of Habeas Corpus" was sufficient to raise a federal

24

due process claim, it is nevertheless procedurally defaulted. The state trial court denied this claim as duplicative of claim five of Harris's postconviction motion. (Doc. 30 Ex. 21 at 138) In ruling on ground five, the state court found that "this trial court issue is one that must be raised on *appeal*." (Doc. 30 Ex. 21 at 91) (emphasis in original)

Accordingly, any federal claim of trial court error as presented in the postconviction "Complaint for Writ of Habeas Corpus" was resolved through the application of an independent and adequate state procedural bar. A petitioner's failure to comply with state procedural rules governing proper presentation of a claim typically bars review of that claim in a federal habeas corpus proceeding. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that a federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Sims v. Singletary*, 155 F.3d 1297, 1311 (11th Cir. 1998) ("A federal court must dismiss those claims that are procedurally barred under state law.").

A state court's procedural ruling constitutes an independent and adequate state rule of decision if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying on a state procedural rule to resolve the federal claim without reaching the merits of the claim; (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law; and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or

25

in a "manifestly unfair manner." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)

(citing *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)).

The procedural bar applied by the state postconviction court was not intertwined with an interpretation of federal law and was also "adequate" to support the state court's decision. To be considered adequate, a rule must be firmly established and regularly followed. *See Lee v. Kemna*, 534 U.S. 362, 376 (2002) ("[V]iolation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim.").

Florida courts regularly follow the rule that claims of trial court error are properly raised on direct appeal, not in a postconviction motion. *See Arteaga v. State*, 246 So.3d 533, 536 (Fla. 2d DCA 2018) ("The postconviction court correctly stated that claims of trial court error are ordinarily remediable on direct appeal and thus not cognizable in a motion for postconviction relief under rule 3.850." (citing *Bruno v. State*, 807 So.2d 55, 63 (Fla. 2001) and *Sampson v. State*, 845 So.2d 271, 272 (Fla. 2d DCA 2003)). Further, there is no indication that this procedural rule was applied to Harris in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." *Judd*, 250 F.3d at 1313.

The state court's reliance on an independent and adequate state bar to dispose of the claim results in a procedural default, and Harris does not show application of either the cause and prejudice or the fundamental miscarriage of justice exception to overcome the default. *Harris v. Reed*, 489 U.S. 255, 262 (1989) ("[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal

claim, unless the habeas petitioner can show" one of these exceptions). Accordingly, Harris is not entitled to relief on Ground One, Sub-claim One.

**B.      Sub-Claim Two: Ineffective Assistance of Appellate Counsel for not Filing Supplemental Briefing**[9]

Harris contends that appellate counsel was ineffective for failing to file a supplemental brief addressing the Florida Supreme Court's decision in *Hazuri v. State*, 91 So.3d 836 (Fla. 2012), which issued after Harris's initial brief and the State's answer brief were filed but before Harris's reply brief was filed. In *Hazuri*, the Florida Supreme Court adopted the rule that "when a jury requests trial transcripts, the trial judge should deny the request, but inform the jury of the possibility of a read-back." *Id.* at 846. Harris contends that if counsel had filed a supplemental brief addressing *Hazuri*, he would have prevailed on appeal because the state appellate court would have determined that the trial court reversibly erred under *Hazuri* by providing transcripts to the jury.

Respondent contends that this claim is waived because Harris abandoned it in state court. Harris raised this claim in his first Rule 9.141 petition alleging ineffective

---

[9] Harris's amended habeas petition is difficult to comprehend, and many of his enumerated claims contain embedded sub-claims that are not clearly identified. The Court is mindful of its obligations to address all claims raised in a § 2254 petition, *see Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992), and to liberally construe *pro se* pleadings, *see Haines v. Kerner*, 404 U.S. 519 (1972). Accordingly, while this sub-claim is not expressly presented as an independent claim for relief, the Court will address it as such. The Court has utilized the same approach in reviewing all grounds in Harris's § 2254 petition.

assistance of appellate counsel. (Doc. 30 Ex. 25) In an amended petition, date-stamped September 26, 2014, he stated that he abandoned the claims raised in the first petition. (Doc. 30 Ex. 27) The state appellate court denied the first Rule 9.141 petition on September 30, 2014. (Doc. 30 Ex. 26) It is apparent from the state appellate court's docket that the amended Rule 9.141 petition was not received by that court before it ruled on the first petition. (*See* Doc. 30 Ex. 28) Because the claim was adjudicated prior to Harris's purported abandonment of it, the Court will assume that Harris satisfied the exhaustion requirement for purposes of this § 2254 proceeding.[10] However, Harris fails to show entitlement to federal habeas relief on this claim.

Appellate counsel's reply brief relied on *Hazuri*, and appellate counsel provided the *Hazuri* opinion to the state appellate court. (Doc. 30 Ex. 8 at 10-15) The proper method of presenting newly issued authority to a reviewing state court is a matter of state procedural law. Furthermore, *Hazuri* interpreted state law; it did not decide a question of federal constitutional law. Thus, both the *Hazuri* opinion and the procedure for informing the state appellate court of that opinion involve questions of state law. By rejecting Harris's claim of ineffective assistance of appellate counsel, the state appellate court has already decided that even if counsel brought *Hazuri* to the state court's attention by submitting supplemental briefing, instead of presenting argument in the reply, Harris would not have succeeded on appeal.

---

[10] The Court will also treat other ineffective assistance of appellate claims in this posture as exhausted.

This Court must defer to the state appellate court's determination of these underlying state law issues. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[The United States Supreme Court has] repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Pinkney v. Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance— even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [counsel] objected to the introduction of Callahan's statements based on [state law]— the objection would have been overruled. . . . Therefore, [counsel] was not ineffective for failing to make that objection.").

As Harris fails to show that the state court's ruling on his ineffective assistance of appellate counsel claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, he is not entitled to relief.

## C.    Sub-Claim Three: Trial Court Error in Providing an *Allen* Instruction

Harris argues that the trial court erred in giving an inadequate instruction to the jury under *Allen v. United States*, 164 U.S. 492 (1896). An *Allen* charge "instructs a

deadlocked jury to undertake further efforts to reach a verdict." *United States v. Chigbo*, 38 F.3d 543, 544 n.1 (11th Cir. 1994). Providing an inherently coercive *Allen* instruction may lead to reversal. *See United States v. Dickerson*, 248 F.3d 1036, 1050 (11th Cir. 2001); *see also Brewster v. Hetzel*, 913 F.3d 1042, 1053-56 (11th Cir. 2019) (explaining that an *Allen* charge is improper when a court coerces a jury to give up an honest belief, suggests which way the verdict should be returned, or otherwise uses duress or coercion).

As an initial matter, Harris does not specifically allege a violation of his federal rights. Accordingly, his claim is not cognizable in this habeas proceeding. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief."). Even if the Court liberally construes Harris's claim as alleging a federal constitutional violation, his claim is procedurally defaulted. On direct appeal, Harris's challenge to the state trial court's instruction was presented solely as a matter of state law. (Doc. 30 Ex. 6 at 35-44) Harris did not allege that his federal constitutional rights were violated or rely on federal authority in support of his claim. (Doc. 30 Ex. 6 at 35-44) Therefore, Harris failed to satisfy the exhaustion requirement. Since Harris cannot return to state court to exhaust the federal claim in another direct appeal, it is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris does not establish that an exception applies to overcome the default. *See id*.

Moreover, even assuming that Harris's appellate claim was sufficient to challenge the state trial court's instruction to the jury on federal constitutional grounds,

since he referred to *Allen*, a federal decision, Harris does not show entitlement to relief under the AEDPA's stringent standards.

The jury sent a note to the trial court stating that they would like to break at 6:00 p.m. and continue deliberations the next day. Their note read, "We are attempting to be very thorough in our deliberations. We would like to continue until 6PM today then recess. What is the procedure?" (Doc. 30 Ex. 2 Vol. VIII at 1189; Ex. 36 at 149) The state trial court responded, "Please continue deliberating. If you have not reached a verdict by 6:00 P.M. let us know and we will make a decision at that time." (Doc. 30 Ex. 2 Vol. VIII at 1189-90; Ex. 36 at 149) At 6:00, the jury sent another note stating, "Jury has not reached a verdict. We must continue deliberation. We request that we recess until tomorrow." (Doc. 30 Ex. 2 Vol. VIII at 1190; Ex. 36 at 149) The trial court responded (Doc. 30 Ex. 2 Vol. VIII at 1190-91):

> Ladies and gentlemen, I read your notes. I know this has been a long trial and you are working very hard. And you've asked to recess and come back tomorrow. Rather than do that, I'm going to ask that you continue deliberating tonight. Please deliberate for another couple of hours. If you are unable to reach a verdict, let me know, and we'll make a decision at that time. So I'm going to ask, please continue your deliberations at this time. Thank you.

The jury reached a verdict later that evening, apparently at 9:40 p.m. (Doc. 30 Ex. 2 Vol. VIII at 1191-92, Ex. 6)[11]

---

[11] Although the trial transcript does not indicate what time the jury reached the verdict, Harris's appellate brief, apparently citing a jury trial data sheet, states that the verdict was reached at 9:40 p.m. (*See* Doc. 30 Ex. 6 at 37; Doc. 78-6 Ex. 47 at 7)

Harris does not show entitlement to relief on his trial court error claim. As an initial matter, the circumstances described did not implicate *Allen*, as the jurors gave no indication that they were deadlocked and could not reach a verdict. Moreover, Harris fails to show that the court's instruction was improperly coercive. No part of the instruction pressured the jurors to believe they were required to reach a decision that evening or to reach any decision at all or indicated that any juror should give up his or her sincerely held beliefs. *See, e.g.*, *Brewster*, 913 F.3d at 1053-56. Rather, the trial court asked the jurors to deliberate further but left open the possibility of continuing deliberations the next day if the jury did not make a decision that evening. Harris offers no evidence that the jury's decision would have been different absent this instruction. Under these facts, Harris has not shown that the state appellate court's rejection of his claim was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable factual determination.

Harris also raised an iteration of this claim in ground five of his first amended postconviction motion, contending that the trial court gave a deficient *Allen* charge. (Doc. 30 Ex. 13 at 30-32) To the extent Harris challenged the trial court's instruction, he failed to allege any violation of his federal rights. (Doc. 30 Ex. 13 at 30-32) Therefore, Harris's presentation of the claim to the state postconviction court failed to exhaust its federal nature. Even assuming that his postconviction motion was sufficient to raise a federal question, the claim is procedurally defaulted. The state postconviction court found that Harris's claim of trial court error was "not cognizable in a motion for post-conviction relief and must be raised on appeal." (Doc. 30 Ex. 21 at 86)

Accordingly, any federal claim of trial court error as presented in the postconviction motion was resolved through the application of an independent and adequate state procedural bar. *See Judd*, 250 F.3d at 1313. As addressed, Florida courts follow the firmly established rule that claims of trial court error are not properly raised in collateral proceedings. *See Arteaga*, 246 So.3d at 536. There is no indication that this procedural rule was applied to Harris in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." *See Judd*, 246 F.3d at 1313.

The state court's reliance on an independent and adequate state bar to dispose of the claim results in a procedural default, and Harris does not show application of either the cause and prejudice or the fundamental miscarriage of justice exception to overcome the default. *See Harris*, 489 U.S. at 262. Therefore, the claim as presented in Harris's postconviction proceedings is barred from federal habeas review. Harris is not entitled to relief on Ground One, Sub-Claim Three.

**D.    Sub-Claim Four: Ineffective Assistance of Appellate Counsel for Failing to Discover and Present Part of the Record**

Harris claims that appellate counsel was ineffective for failing to discover a portion of the record and address it on appeal. As Respondent notes in the supplemental response, Harris appears to refer to the "Defendant's pro se Supplement to Counsel's Motion for New Trial", which he claims addressed the question of the jury's receiving transcripts during deliberations. As Respondent further notes, it appears from the record on appeal index that this paper was indeed included on the

record on appeal. (Doc. 78-6, Ex. 47 at 8) Harris chose not to file a reply to the supplemental response and therefore does not contest Respondent's assertion that the paper was presented to the state appellate court. Respondent correctly contends that this claim is unexhausted because Harris did not raise it in any of his Rule 9.141 state habeas petitions alleging ineffective assistance of appellate counsel. (Doc. 30 Exs. 25, 27, 36)

Although Harris touched on the question of the transcript in one of his claims, stating that in filing the answer brief, the State "took advantage of Appellate Counsel's omission of the adopted *pro se* motion on the transcript issue", he failed to specifically identify a distinct claim for relief alleging ineffective assistance of appellate counsel for not identifying part of the record. (Doc. 30, Ex. 36 at 10). Even assuming that this reference to the allegedly omitted paper was sufficient to present the independent claim that appellate counsel was ineffective for not presenting and utilizing the identified paper, the claim is procedurally defaulted because Harris's Rule 9.141 petition was dismissed as successive. (Doc. 30 Ex. 37)

The state appellate court disposed of Harris's federal claim on an independent and adequate state procedural basis. *See Judd*, 250 F.3d at 1313. Florida courts regularly follow the firmly established rule that a petitioner is not entitled to file second or successive petitions alleging ineffective assistance of appellate counsel, or "IAAC", under Rule 9.141. *See Morris v. State*, 134 So.3d 1066, 1067 (Fla. 4th DCA 2013) ("It is well recognized that generally only one . . . IAAC petition is allowed."). Harris does not show that this rule was unfairly or arbitrarily applied to him. *See Judd*, 250 F.3d at

1313. Therefore, the claim is procedurally defaulted, and Harris fails to show that either the cause and prejudice or the fundamental miscarriage of justice exception applies to overcome the default. *See Harris*, 489 U.S. at 262. Harris is not entitled to relief on Ground One, Sub-claim Four.

## II.     Ground Two

### A.     Sub-Claim One: Federal Double Jeopardy Violation

Harris claims that his convictions for kidnapping and sexual battery violate federal double jeopardy principles because the State charged that the kidnapping was undertaken with the intent to commit sexual battery. Harris did not raise a double jeopardy claim on direct appeal. (Doc. 30 Ex. 6)

Harris did raise a double jeopardy claim in state postconviction proceedings, in a "Complaint for Writ of Habeas Corpus". (Doc. 30 Ex. 16 at 9-10)[12] However, Harris failed to exhaust the federal nature of the double jeopardy claim in the state "Complaint for Writ of Habeas Corpus". (Doc. 30 Ex. 16 at 9-10) In the introductory sections of the state "Complaint for Writ of Habeas Corpus", Harris referred to "Article I, section 9, United States Constitution" to support his contention that he was entitled to file a habeas petition and claimed that his "substantial constitutional rights"

---

[12] Harris cites ground seven of his postconviction motion. However, that claim was one of ineffective assistance of trial counsel for not raising double jeopardy in the motion for judgment of acquittal—not an independent double jeopardy claim. (Doc. 30 Ex. 13 at 35-37, Ex. 14 at 3-5) Furthermore, Harris did not address a federal double jeopardy claim in this context of ineffective assistance of trial counsel. (Doc. 30 Ex. 13 at 35-37, Ex. 14 at 3-5)

were affected. (Ex. 16 at 1-2) But he made no reference to the Fifth Amendment's Double Jeopardy Clause or to federal double jeopardy principles in the state "Complaint for Writ of Habeas Corpus". (Ex. 16 at 9-10)

Accordingly, Harris's federal double jeopardy claim is unexhausted. Harris cannot return to state court to present the federal nature of the claim. *See* Fla. R. App. P. 9.140(b)(3); Fla. R. Crim. P. 3.850(b) (a postconviction motion must be filed within two years of the date the judgment and sentence become final).[13] The federal double jeopardy claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris does not show that an exception applies to overcome the default. *See id*. Therefore, Ground Two, Sub-Claim one is barred from federal habeas review.

Alternatively, notwithstanding the default, Harris fails to show entitlement to relief. "The Double Jeopardy Clause . . . protects against multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (internal quotation marks and citation omitted). The Double Jeopardy Clause permits cumulative punishments for a single incidence of criminal behavior when the legislature clearly intends cumulative punishments. *Williams v. Singletary*, 78 F.3d 1510, 1512 (11th Cir. 1996). Absent a clear indication of contrary legislative intent, the "same-elements" test announced in *Blockburger v. United States*, 284 U.S. 299 (1932), determines whether separate statutory provisions authorize cumulative punishment for a single criminal incident. *Williams*, 78 F.3d at 1512-13. Florida has adopted the *Blockburger* test. § 775.021(4)(b), Fla. Stat.

---

[13] A double jeopardy claim may be raised in a Rule 3.850 postconviction motion. *Banks v. State*, 211 So.3d 1104 (Fla. 5th DCA 2017).

The "same-elements" test examines whether each offense contains an element not contained in the other offense. "[I]f each statutory offense requires proof of an element not contained in the other, the offenses are not the 'same' and double jeopardy is no bar to cumulative punishment." *Williams*, 78 F.3d at 1513. Otherwise, "where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." *United States v. Dixon*, 509 U.S. 688, 696 (1993).

Here, Harris's convictions pass *Blockburger*'s same-elements test. He was charged in count one with sexual battery under § 794.011(4)(g) and (9), Fla. Stat. (2010), and in count two with kidnapping by confining, abducting, or imprisoning the victim with the intent to commit or facilitate the commission of sexual battery, under § 787.01(1)(a)2., Fla. Stat. (2010). Each offense contains an element that the other one does not.[14] Therefore, Harris fails to show that the state appellate court's rejection of a federal double jeopardy claim was contrary to or involved an unreasonable application of clearly established federal law. He is not entitled to relief on Ground Two, Sub-claim One.

---

[14] The elements of sexual battery in this case are: (1) J.A. was 12 years of age or older; (2) Harris committed an act upon J.A. in which Harris's sexual organ penetrated or had union with J.A.'s vagina; and (3) the act was committed without the consent of J.A. (Doc. 30 Ex. 2 Vol. VIII at 1164) *See* § 794.011(4)(g) and (9), Fla. Stat. (2010). The elements of kidnapping in this case are: (1) Harris forcibly, secretly or by threat confined, abducted or imprisoned J.A. against her will; (2) Harris had no lawful authority; and (3) Harris acted with intent to commit or facilitate commission of sexual battery. (Doc. 30 Ex. 2 Vol. VIII at 1164-65) *See* § 787.01(1)(a)2., Fla. Stat. (2010).

**B.    Sub-Claim Two: Ineffective Assistance of Trial Counsel for not Raising Double Jeopardy**

Harris contends that trial counsel was ineffective in not raising double jeopardy. In his postconviction motion, Harris asserted that trial counsel should have argued in moving for a judgment of acquittal that conviction for sexual battery and kidnapping would have violated double jeopardy under the principle announced in *Faison v. State*, 426 So.2d 963 (Fla. 1983). Harris cannot obtain relief.

Section 787.01, Fla. Stat., provides the following definition of kidnapping (emphasis added):

> (1)(a) The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
>
> 1. Hold for ransom or reward or as a shield or hostage.
>
> 2. **Commit or facilitate commission of any felony**.
>
> 3. Inflict bodily harm upon or to terrorize the victim or another person.
>
> 4. Interfere with the performance of any governmental or political function.

Harris was charged under § 787.01(1)(a)2., with kidnapping with the intent to commit sexual battery. (Doc. 30 Ex. 1) *Faison* holds that "the proper construction of" § 787.01(1)(a)2. is "that 'confining, abducting, or imprisoning another person . . . with intent to commit or facilitate commission of any felony' does not include movement or confinement that is inconsequential or inherent in the nature of the felony." *Faison*, 426 So.2d at 966 (quoting *Harkins* [*v. State*], 380 So.2d [524,] 528 [(Fla. 5th DCA

38

1980)]). Therefore, a defendant cannot be convicted of both kidnapping with the intent to facilitate the commission of a felony, as well as the underlying felony, if the confinement or movement of the victim during the kidnapping is "inconsequential or inherent in the nature of the [underlying] felony." *See id*.

The state court rejected Harris's ineffective assistance of trial counsel claim, finding that the *Faison* argument proposed by Harris would have failed. The court first discussed the victim's testimony, describing how events unfolded with respect to Harris waving at her to pull over, using her ATM card, and later sexually assaulting her in his car. (Doc. 30 Ex. 21 at 98) The state court then quoted at length counsel's motion for judgment of acquittal, as well as counsel's renewed motion for judgment of acquittal and motion for new trial. (Doc. 30 Ex. 21 at 98-101) Trial counsel argued that, given the length of time between the handcuffing of the victim and the sexual battery, the State had not shown that Harris had the intent to commit sexual battery at the time he kidnapped the victim. (Doc. 30 Ex. 21 at 98-101) The state court concluded (Doc. 30 Ex. 21 at 101-02):

> In light of the evidence presented at trial, this Court does not agree with Defendant's characterization of counsel's argument as "patently erroneous," as it was a reasonable argument under the circumstances.

> As to Defendant's specific allegation in claim seven of ineffective assistance of counsel, the Court notes that Defendant's claim is that, had counsel argued in the motion for judgment of acquittal or motion for new trial that a conviction for Kidnapping was prohibited under the *Faison* test, that such would have resulted in a judgment of acquittal on count two or new trial on this basis. In light of the record and evidence presented at trial, this Court does not find there to be a reasonable probability that the trial court would have granted a judgment of acquittal or new trial on this basis.

39

The state court, after reviewing relevant portions of the record, found that an argument for judgment of acquittal would not have been granted had counsel raised an argument based on *Faison* and that counsel performed reasonably in presenting an alternative argument. The state court's ruling relies on an application of Florida law: whether the convictions were valid under state law as set out in *Faison*. This Court must defer to the state court's interpretation of *Faison* in reviewing the state court's decision on Harris's ineffective assistance of trial counsel claim. *See Pinkney*, 876 F.3d at 1295; *Callahan*, 427 F.3d at 932. Accordingly, Harris fails to show that the state court unreasonably applied *Strickland* or that its decision was based on an unreasonable determination of fact. He is not entitled to relief on Ground Two, Sub-Claim Two.

## C.     Sub-Claim Three: Ineffective Assistance of Appellate Counsel for not Raising Double Jeopardy

Harris contends that appellate counsel was ineffective for not arguing that his convictions violated double jeopardy principles. Harris raised this claim in his initial Rule 9.141 petition alleging ineffective assistance of appellate counsel. (Doc. 30 Ex 25) The state appellate court denied the claim without discussion. (Doc. 30 Ex. 26)

Harris did not claim that appellate counsel should have argued that his convictions violated federal double jeopardy principles. (Doc. 30 Ex. 25 at 15-17) Rather, he claimed that appellate counsel should have argued that double jeopardy barred his kidnapping conviction under *Faison*. (Doc. 30 Ex. 25 at 15-17) On appeal,

40

counsel did argue that there was insufficient evidence to sustain the kidnapping conviction under *Faison*. (Doc. 30 Ex. 6 at 45-47) In arguing ineffective assistance of appellate counsel, therefore, Harris argued that appellate counsel should have framed the *Faison* issue as one of double jeopardy, rather than insufficiency of the evidence. (Doc. 30 Ex. 25 at 15-17)

As with his ineffective assistance of trial counsel claim, Harris's ineffective assistance of appellate counsel claim turns upon the application of state law. The state appellate court has determined that even if appellate counsel argued *Faison* in support of a state law double jeopardy claim, such a claim would have been rejected and Harris's appeal would not have succeeded. This Court must defer to the state appellate court's determination of state law. *See Pinkney*, 876 F.3d at 1295; *Callahan*, 427 F.3d at 932.

Harris fails to show that the state appellate court unreasonably applied *Strickland* in denying Harris's claim. Nor does he show that the state court's decision was based on an unreasonable factual determination. Harris is not entitled to relief on Ground Two, Sub-Claim Three.

### D.   Sub-Claim Four: Erroneous Jury Instruction on False Imprisonment

Harris contends that the state court erred in providing an erroneous jury instruction on false imprisonment, which is a lesser-included offense of kidnapping. *See* Fla. Std. Jury Instr. (Crim.) 9.1. Harris claims that the instruction omitted required language. Harris's challenge to the validity of the jury instruction is a question of state

41

law. Since the claim raises a state law matter, it is not cognizable in this § 2254 proceeding. *Branan*, 861 F.2d at 1508. Ground Two, Sub-Claim Four warrants no relief.

### E.    Sub-Claim Five: Ineffective Assistance of Appellate Counsel for not Challenging the Instruction on False Imprisonment

Harris argues that appellate counsel was ineffective for failing to challenge the allegedly erroneous false imprisonment instruction on direct appeal. Harris raised this claim in his first Rule 9.141 state habeas petition, which the state appellate court denied without discussion. (Doc. 30 Ex. 25)

Harris fails to show entitlement to relief. No objection to the instruction was made at trial. (Doc. 30 Ex. 2 Vol. VII at 978-83, 1084; Vol. VIII at 1170-71) Because the issue was therefore unpreserved for appellate purposes, it could have been raised on appeal only as fundamental error. *See Steinhorst v. State*, 412 So.2d 332, 338 (Fla. 1983) ("Except in cases of fundamental error, an appellate court will not consider an issue unless it was presented to the lower court."). Fundamental error "goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process." *Bailey v. State*, 998 So.2d 545, 554 (Fla. 2008).

By rejecting Harris's ineffective assistance of appellate counsel claim, the state appellate court has determined that any error in the jury instruction did not amount to reversible fundamental error under state law and that Harris therefore would not have prevailed had appellate counsel raised the issue. This Court must defer to the state

court's ruling on the underlying state law question of the correctness of the jury instruction. *See Pinkney*, 876 F.3d at 1295; *Callahan*, 427 F.3d at 932.

Harris does not show that the state appellate court's rejection of his ineffective assistance of appellate counsel claim involved an unreasonable determination of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Two, Sub-Claim Five.

### F.    Sub-Claim Six: Ineffective Assistance of Trial Counsel for not Objecting to the Jury Instructions

Harris contends that trial counsel was ineffective for failing to challenge the jury instruction on false imprisonment. Respondent contends that this claim is unexhausted because, although Harris brought the claim in his Rule 3.850 postconviction motion, he failed to brief the claim on appeal from the denial of that motion. The record shows that Harris did not raise this issue in his collateral brief. (Doc. 30 Ex. 22) Accordingly, he failed to exhaust this claim. *See, e.g.*, *Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979) ("In Florida, exhaustion usually requires not only the filing of a Rule 3.850 motion, but an appeal from its denial."); *see also Simmons v. State*, 934 So.2d 1100, 1111 n.12 (Fla. 2006) (stating that in Florida, an appellant is considered to have abandoned claims that were not briefed with specific argument). Harris cannot return to state court to appeal the claim. *See* Fla. R. Crim. P. 3.850(k) (stating that an appeal from denial of a postconviction motion may be taken within 30 days of rendition of the final order denying relief). Therefore, this claim of

ineffective assistance of trial counsel is procedurally defaulted, and Harris fails to show

that an exception applies to overcome the default. *See Smith*, 256 F.3d at 1138.

Notwithstanding the default, Harris cannot show entitlement to relief. The state

postconviction court rejected Harris's claim, finding that he could not show prejudice

from counsel's performance (Doc. 30 Ex. 21 at 94-95) (state court record citation

omitted):

> [W]here a jury "is instructed about lesser-included offenses, the
> instruction specifically allows the jury to consider a lesser-included
> offense only if it decides that the main accusation has not been proved
> beyond a reasonable doubt." *Sanders v. State*, 946 So.2d 953, 958 (Fla.
> 2006). Such is not the case here, the jury found Defendant guilty of the
> charged offense. Under such circumstances, a defendant cannot
> demonstrate the requisite prejudice necessary for post-conviction relief.
> *See Sanders*, 946 So.2d at 956-960 (explaining that "[t]he possibility of a
> jury pardon cannot form the basis for a finding of prejudice"). As
> defendant cannot demonstrate prejudice on his claim, his allegation . . .
> warrants no relief.

Harris does not show that the state court unreasonably rejected his claim on

*Strickland*'s prejudice prong. In *Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x 888

(11th Cir. 2012), a panel of the Eleventh Circuit addressed the *Sanders* decision.

*Santiago* affirmed the district court's rejection of a § 2254 claim that trial counsel was

ineffective for not requesting an instruction on a lesser-included offense. The Eleventh

Circuit stated, "[t]he jury in Santiago's trial concluded that the evidence against him

supported his conviction for the greater offenses on which it was instructed; therefore,

even if the lesser-offense instructions had been given, the jury would not have been

permitted to convict Santiago of the lesser included offenses because it had concluded

that the evidence established that he was guilty of the greater offenses." *Id*. at 889.

44

Therefore, the *Santiago* court "cannot say that the Florida appellate court unreasonably applied *Strickland*." *Id.*; *see also Harris v. Crosby*, 151 F. App'x 736, 738 (11th Cir. 2005) ("Harris's assertions that he would have been convicted of the lesser included offense, as opposed to the greater offense, are pure speculation . . . that the jury, if instructed on the lesser included offense, would have convicted on it instead of the higher offense. That speculation is insufficient to undermine our confidence in the outcome of his trial.").

The state postconviction court similarly concluded that, under *Sanders*, Harris could not show prejudice as a result of his counsel's failure to object to the instruction on the lesser charge because the jury convicted him of the greater charge. Harris does not show that the state court unreasonably applied *Strickland* in denying his claim. Nor does he establish that the state court's ruling was based on an unreasonable factual determination. Harris is not entitled to relief on Ground Two, Sub-Claim Six.

## III.   Ground Three

### A.   Sub-Claim One: *Brady* Violation

Harris claims that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by suppressing exculpatory evidence. Harris contends that the State failed to turn over OnStar records concerning his car's location on the night of the incident and a satellite phone call made from his car to an OnStar operator, as well as a digital recording device obtained either from his car or his person.

Harris raised a *Brady* claim in his Rule 3.850 motion for postconviction relief, which the state court denied. The Court finds that the *Brady* claim is unexhausted because Harris did not brief it on appeal from denial of the Rule 3.850 motion. (Doc. 30 Ex. 22) Since Harris cannot return to state court to appeal the denial of this claim, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138.  As Harris does not show the applicability of an exception to overcome the default, the claim is procedurally defaulted. *See id*. Therefore, the Court finds that this claim is barred from review.

Notwithstanding the default and resulting bar, however,[15] Harris fails to show entitlement to relief. *Brady* holds that a prosecutor's failure to disclose evidence favorable to a criminal defendant violates due process if the evidence is material to either guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Under clearly established Supreme Court precedent, to establish a *Brady* violation a petitioner must show that (1) the evidence is favorable to the accused, either because it is exculpatory or it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the evidence is material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Nondisclosed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have

---

[15] Respondent does not address the default for failure to exhaust the *Brady* claim on collateral appeal. Rather, Respondent appears to contend that this Court should consider the *Brady* claim defaulted because a trial court error claim must be made on direct appeal, not on postconviction review. However, the *Brady* claim challenges the actions of the State, not the trial court, and the state postconviction court did not find that the *Brady* claim was improperly raised in the postconviction motion.

46

been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A defendant cannot meet the second prong when, 'prior to trial, [he] had within [his] knowledge the information by which [he] could have ascertained the alleged *Brady* material." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014) (quoting *Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005)).

Harris raised the *Brady* claim in his postconviction motion. With respect to the OnStar records, the state court found (Doc. 30 Ex. 21 at 59-60) (state court record citations omitted) (emphasis in original):

> As to claim two concerning *On Star* records, Defendant contends that *On Star* records from his vehicle were withheld or concealed and that these records were exculpatory and impeaching and directly relevant to his case. Specifically, Defendant contends that the *On Star* records would have provided real-time locations of the vehicle during the relevant time period that would have been inconsistent with his accuser's story. Defendant also contends that these records would have shown that his accuser was seated in the front seat, again inconsistent with her story that she was in the back seat. He also contends that these records would have shown that he had made at least one call to an *On Star* operator during the relevant time period during which the accuser made no cry for help. [FN1] Defendant contends that "at least three General Motors representatives," whom he names in his Motion, would have been available for trial and would confirm that Defendant's representation of the system records is true and correct. Defendant contends that "counsel was also aware of the *On Star* records, but deliberately delayed the production of this exonerating evidence," and asserts that he has obtained these *On Star* records and that they "will be played for the court at the forthcoming evidentiary hearing."
>
> > [FN1] The Court incorporates into this portion of claim two the related allegation from claim three wherein Defendant referenced "the vehicle's sensors monitored by 'On-Star' records, as set forth in claim 2 of this post-conviction

motion" and his allegation in claim three that "the recording of the satellite phone calls made from within the vehicle's *On-Star* system would have captured [his accuser's] voice [and] where the operator would have testified that there was no distress or emergency detected by the two occupants of the vehicle."

The Court notes that Defendant does not allege in this portion of claim two concerning *On Star* that the *State* suppressed these records from Defendant, and thus cannot warrant any relief on this claim to any extent it attempts to assert a *Brady* violation. *See Reichman v. State*, 966 So.2d 298 (Fla. 2007) (explaining the elements of a *Brady* violation, among which is willful or inadvertent suppression *by the State*). [FN2]

> [FN2] In fact the State sought these records from Defendant, as reflected in the record where the State asserted that, to the extent of any alleged "OnStar records the defendant is planning on using in his case-in-chief, I would ask that a copy be turned over to the State immediately."

The state court's order then turned to the claim of ineffective assistance of trial counsel for allegedly delaying providing the OnStar records to Harris. Harris does not raise that specific instance of ineffective assistance in the § 2254 petition, but some of the state court's discussion is relevant to Harris's underlying *Brady* claim. The state court continued (Doc. 30 Ex. 21 at 60-61):

> As explained above, the record reflects that Defendant's appointed counsel in this case had wanted to move to continue the case to be able to conduct further investigation in preparation of Defendant's defense, but that Defendant chose to represent himself at trial rather than agree to such a continuance. In fact, one of the specific reasons for counsel needing more time to investigate this case prior to trial was that counsel had not yet been able to complete its investigation "regarding OnStar records, that could potentially lead to evidence consistent with the Defendant's innocence." The record reflects further that, prior to opening statements, Defendant was provided with the information concerning these *On Star* records in the possession of the Office of the Public Defender, despite that information being work product. At trial, after

Defendant referenced *On Star* records in his opening statements to the jury, the parties addressed this issue outside the presence of the jury during which the court explained to Defendant the process of subpoenaing witnesses and that Defendant would not be precluded from eliciting relevant testimony from any witness that had been properly served, but that there would be no way the witness that Defendant had wanted to testify concerning these records would be physically able to testify in his trial.

The order then noted that the court questioned the Assistant Public Defenders

about the records (Doc. 30 Ex. 21 at 65) (state court record citation omitted):

> THE COURT: Mr. Harris has indicated this morning that he just received this information from the Public Defender's Office. Apparently[,] it has to do with OnStar information. He just received it this morning and that it would assist him in the preparation of his defense. [ ]
>
> When I spoke with you [counsels], I believe it was Thursday, and Mr. Harris discharged the Office of the Public Defender from any further responsibility, you all indicated to the Court that you would provide Mr. Harris with everything that you had within your possession other than work product. Is this work product, this OnStar?
>
> [ASSISTANT PUBLIC DEFENDER]: Your Honor, this is documents [sic] that my investigator received. Normally we do not provide this to our clients. This is something that I would use in my preparation for the case. I have discussed this very document at length months ago leading up until when I receive [sic] this additional document. I had provided him, just in an abundance of caution, the OnStar record we had received, the original records that [the investigator] gotten [sic] through his investigative efforts.
>
> THE COURT: All right.

The state court's order also noted that Harris brought up the OnStar records at the

January 13, 2011 hearing concerning the reappointment of the Office of the Public

Defender. The state court cited Harris's statements that he had received the OnStar

49

records in the possession of the Office of the Public Defender, and his acknowledgment that he had elected to proceed *pro se* despite knowing that the Office of the Public Defender wanted more time to investigate the OnStar records. (Doc. 30 Ex. 21 at 66-67) The state court also stated that the Office of the Public Defender cited further investigation of the OnStar records in moving for a mistrial due to necessity upon reappointment in this case. (Doc. 30 Ex. 21 at 66-67)

Harris fails to show that the state court unreasonably rejected his *Brady* claim. Initially, Harris fails to demonstrate suppression of evidence that was in fact exculpatory; as the state court noted, the record discloses no indication that the State possessed such evidence but failed to turn it over to the defense. *See Banks*, 540 U.S. at 691. To the contrary, as detailed at length in the state court's order, Harris was aware of evidence concerning the OnStar system, and he was also aware that the Office of the Public Defender wanted more time to investigate this evidence to determine if it would help the defense. As Harris knew of the existence of this potential evidence, he cannot establish any *Brady* violation with respect to the OnStar records. *See Wright*, 761 F.3d at 1278 (stating that there can be no *Brady* violation when the defense is aware of the evidence); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that *Brady* applies to situations involving "the discovery, after trial of information which had been known to the prosecution but unknown to the defense."). Harris fails to show that the state court's denial of his *Brady* claim concerning the OnStar records was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable factual determination.

50

The state court also rejected Harris's *Brady* claim concerning a recording device

(Doc. 30 Ex. 21 at 68-72) (state court record citations omitted):

> As to claim two concerning a "digital recorder" and/or "digital recordings," Defendant contends that there were "digital recording records [that] were exculpatory and impeaching," but that the State "did destroy those digital recordings and never produced the actual recorder" and that "defense counsel was aware of the digital recorder . . . but failed to secure it for evidence." Defendant also contends that he objected and notified the trial judge but that "the trial court never conclusively ruled on whether there was in fact a discovery violation; never touched on [ ] the missing evidence; and never conducted a *Richardson* hearing to remedy the situation." As such, the Court notes that Defendant appears to raise in this portion of claim two allegations of a *Brady* violation, ineffective assistance of counsel, and trial court error all relating to this alleged "digital recorder" and/or "digital recordings."[16]

> More specifically, Defendant contends in this portion of claim two that, "[d]uring his arrest a black digital recorder was taken from Harris, which the State destroyed. (Exhibit "H", deposition of Officer Juan Pablo Alvarez)." Defendant contends that "the missing digital recorder contained audio conversations between Harris and his accuser where she was instructing him on what to do with her ATM Bank card. It also demonstrated that she was not "Kidnapped" and was not in his company without 'consent.'" Defendant contends that "[t]he State knew of all the evidence and destroyed the digital recorder," asserting specifically that "[the Assistant State Attorney] in conspiracy with Detectives Ruth Cate and Desiree Ayo, did destroy those digital recordings and never produced the actual recorder." Defendant contends that these "digital recording records were exculpatory and impeaching" and "would have acquitted Harris," and that the destruction or concealing of this evidence "egregiously prejudiced Harris's trial preparation where they became a major feature of the trial, but were never made privy to the jury." Defendant contends further that, "[w]ith respect to the prosecutorial and police misconduct, Harris informed [the court] that he would be serving a subpoena on [the] assistant state attorney, 'regarding another digital recording of [him] and [his] accuser having a conversation that the State has been in possession of" and that "Harris informed the court that this

---

[16] Again, although the ineffective assistance of trial counsel claim identified by the state postconviction court is not raised in the § 2254 petition, the factual background of that claim is relevant to the underlying *Brady* issue.

was 'going to end up being some type of discovery issue.'" Defendant contends that "the trial court never conclusively ruled on whether there was in fact a discovery violation; never touched on [ ] the missing evidence; and never conducted a Richardson hearing to remedy the situation." Additionally, Defendant contends that "defense counsel was aware of the digital recorder by way of Officer Alvarez' deposition, but failed to secure it for evidence," and that "[a] Tampa police officer, a detective, and a member of the public defender's office had made several requests to [the assistant state attorney] to produce the digital recorder, but she was repeatedly evasive about it." Defendant contends that, to substantiate this portion of the claim [a defense counsel and investigator], Officer Juan Pablo Alvarez; Detective Raymond Estevez; and Officer Eric Small will all provide under-oath testimony consistent with these facts."

As explained in length above, Defendant's appointed counsel in this case had wanted to move to continue the case to be able to conduct further investigation in preparation of Defendant's defense, but Defendant chose to represent himself at trial rather than agree to such a continuance, thereby foreclosing any opportunity for further investigation and preparation. In fact, one of the specific reasons for counsel needing more time to investigate this case prior to trial was that counsel had not yet been able to review items removed from Defendant's vehicle. The record reflects that, at trial, prior to opening statements, Defendant referenced that he anticipated receiving a digital recording of a conversation between he and his accuser from inside his car, which he asserted was in the State's possession but had not yet been turned over. Specifically, Defendant asserted that he believed this would "end up being some type of discovery issue" and that, as it had not yet been turned over by the State, he wanted [the] Assistant State Attorney to testify about this. The Assistant State Attorney responded that she was not aware of any evidence within the State's possession that had not been turned over pursuant to the rules of discovery, and that [she] specifically had no knowledge of any evidence in the State's possession of the defendant and the accuser having a conversation, noting that such was not mentioned in the police report. At the closed hearing on January 13, 2011, the court then specifically addressed the issue of this alleged digital recording and/or digital recorder—outlined at length above—during which Defendant acknowledged that the Officer of the Public Defender, while represented Defendant, "had been effectively trying to receive [the digital recording that the State] for one reason or another was not turning it over." The Assistant Public Defender then asserted that there had been some conflict in the depositions from the investigating officers as to

whether this recorder actually existed and/or was seized, but that, regardless, this "would be among the matters that had not yet been resolved in the time period leading up to the time of the trial in this cause." Defendant then specifically acknowledged that, even knowing that this matter required further investigation and that such was a consideration in counsel's basis for needing a continuance, Defendant still wished to proceed to trial without this issue being yet resolved.

. . .

As to Defendant's *Brady* claim within this portion of ground two concerning these alleged digital records and/or digital recordings, the Court notes that Defendant is alleging that, at the start of his trial, he notified the trial court of the existence of a digital recorder and/or recording of himself and his accuser inside his vehicle on the night of the offense, which he contends was in the State's possession, and which he anticipated receiving from the Office of the Public Defender. The Court notes, however, that a defendant warrants no relief on an alleged *Brady* claim in a post-conviction motion where the defendant was aware of the potential evidence at the time of the trial and could have discovered the details surrounding that evidence through reasonable diligence. *See e.g. Freeman v. State*, 761 So. 2d 1055, 1062-1063 (Fla. 2000). Specifically, the Court notes that

> "There is no *Brady* violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence." *Provenzano v. State*, 616 So. 2d 428, 430 (Fla. 1993) (citing *Hegwood v. State*, 575 So. 2d 170, 172 (Fla. 1991); *James v. State*, 453 So. 2d 786, 790 (Fla. 1984)). . . . "[A] *Brady* claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot be found to have been withheld from the defendant." *Owen v. State*, 986 So. 2d 543, 547 (Fla. 2008) (quoting *Occhicone*, 768 So. 2d at 1042). Thus, evidence is not suppressed where the defendant was aware of the information. *See Way*, 760 So. 2d at 911; *see also Tompkins v. State*, 872 So. 2d 230, 239 (Fla. 2003) (no suppression where defense was given illegible copy of police report because defense knew about report and could have requested a legible copy); *Provenzano*, 616 So.2d at 430 (no *Brady*

> violation where defendant could have obtained his jail records from jail officials and could have reviewed the notes of the State expert witness if he had requested them).

*Floyd v. State*, 18 So.3d 432, 451 (Fla. 2009). As Defendant was aware of this potential evidence at the time of his trial, it was Defendant's responsibility at that time to properly bring the issue before the trial court through an objection and request for *Richardson* hearing, if in fact he believed this evidence was being withheld by the State. *See e.g. Major v. State*, 979 So. 2d 243, 245 (Fla. 3d DCA 2007) (noting that, "[w]hen the defendant does not raise an objection to the state's purported discovery violation, a trial court is not required to conduct a further inquiry."). Under these circumstances, Defendant warrants no relief on his *Brady* claim.

Harris fails to show that the state court unreasonably denied his claim, as he fails to show that the State suppressed evidence favorable to him. While he relies on the deposition of Officer Alvarez, the deposition does not establish a *Brady* violation (Doc. 78-2 Ex. 13 Deposition of Officer Juan Pablo Alvarez at transcript pp. 32-36):

A    And I do remember something else, something that was found was a recorder. Some recorder was found on him.

Q    On him?

A    Yeah.

Q    Do you remember where it was found on him?

A    No.

Q    Is this during the pat down search?

A    I think it was either found on him or in the car. We were made aware of some recorder that I recall.

Q    Do you remember yourself physically finding the recorder?

A    No, no, I don't, no.

Q    Was it - -

A    We were just made aware of the recorder.

Q    Okay. So at some point the recorder is found, you think, from the vehicle?

A    From the vehicle or either on him, somebody else found it on him. I just remember finding the cell phone.

Q    Okay. Well did someone else also do a pat down search of him to find the recorder?

A    I want to say Eric was - - had patted him down too. We patted him down a couple of time[s] to make sure he didn't have any weapons hidden from - - on him.

Q    And you said you never found the recorder?

A    No, ma'am.

Q    So do you know who found it or when that would have been?

A    No, I don't, I don't.

Q    And at this point in time you're saying you recall a recorder?

A    Right.

Q    Was - - did someone else give you information that we found it on him or - -

A    There was - - they called me and Eric Small because we're both Spanish speakers and tried to hear what the recorder was saying. And then we were made aware of how he had recorded almost everything, conversations with his lawyer, conversations in open court, court hearing he had the recorder on. He recorded almost every phone call he made.

Q    Did you listen to all of these recordings?

55

A     I didn't. Officer Eric Small did. He was talking to somebody in Spanish about the court, about the girlfriend or something like that, but I don't know.

Q     Are - - do these appear to be old court hearings?

A     Pretty recent. I would say within the last year. Not too old.

Q     Do you remember anything about those recordings or what was contained on them?

A     No. Just that it was court proceedings, phone calls with the lawyer, him being frustrated with the lawyer, for the lawyer being frustrated with him. But we were saying how we don't think those people knew they were being recorded at the time when he was recording them.

Q     Do you know what happened with that recording device?

A     No, I don't.

Q     And you said Officer Small actually listened to everything?

A     Just the conversations in Spanish.

Q     Okay.

A     It was a brief conversation.

Q     It was just one conversation?

A     I want to say it was just one or two conversations.

Q     Okay. Is that the one that you're referring to as well that you heard?

A     Right. But - - and then the detective also advised us of some of the recordings that were on it.

Q     Okay. So you didn't listen to the other recordings?

A     No.

Q     Just those Spanish recording?

A     Right. Overheard.

Harris fails to show that the state court unreasonably determined that he could not make out a *Brady* claim. Harris does not show that the State suppressed exculpatory evidence. Officer Alvarez's testimony that police possessed a recording device recovered from Harris's car or person suggests that the recording device may have been lost or destroyed.  However, Officer Alvarez had no knowledge of whether the device in fact contained exculpatory recordings of conversations between Harris and J.A. in the car, as Harris claims. And Harris has not come forward with any other evidence about the recorder's contents.[17] Thus, Harris's allegation is insufficient to show a *Brady* violation. *See Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999) (stating that, even when there is non-disclosed evidence, "[a] court cannot speculate as to what evidence the defense might have found if the information had been disclosed."). Harris simply does not show that any recording on the device was favorable to him and the State failed to disclose it to him.

As thoroughly detailed in the state court's order, Harris knew of the recording device and, under state procedures governing discovery violations, could have moved the state court to consider the circumstances surrounding this item if he believed it was withheld.  A defendant who knows of evidence but fails to secure it cannot establish a

---

[17] Harris makes a generalized contention of newly discovered evidence about the State's alleged destruction of evidence. However, Harris does not present any such evidence. Harris's wholly speculative and conclusory assertion falls short of demonstrating a *Brady* violation.

*Brady* violation. *See Agurs*, 427 U.S. at 103; *Wright*, 761 F.3d at 1278. In addition, Harris's statements at the January 11, 2013 conflict hearing before Judge Fuente show that Harris knew attorneys from the Office of the Public Defender were trying to obtain a recording device that he believed contained exculpatory recordings, yet he insisted on proceeding to trial within the speedy trial timeframe rather than consent to his attorneys' request for a continuance to complete discovery. (Doc. 30 Ex. 46 at 51-52)

Under these circumstances, Harris cannot meet his burden under the AEDPA's stringent standards of showing that the state court's adjudication of his *Brady* claim was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable factual determination. Harris is not entitled to relief on Ground Three, Sub-Claim One.

### B.   Sub-Claim Two: Ineffective Assistance of Trial Counsel for not Raising *Brady* at the Hearing on Motion for Mistrial

Harris alleges that trial counsel was ineffective for failing to raise the alleged *Brady* violation in moving for a mistrial due to necessity when counsel was re-appointed.[18] This claim is unexhausted because Harris did not raise it in his

---

[18] The motion for mistrial filed by the Office of the Public Defender stated that the attorneys from that Office had not attended the trial; were unaware of the court's rulings on motions in limine; had not yet reviewed videos that the State intended to introduce; were unaware of any knowledge of individual jurors since counsel was not present at jury selection; had no knowledge of any "themes" of either side; were unaware of the content of the opening statements; had no knowledge of what the witnesses who were already called had testified to; and had not completed an investigation into the OnStar records. (Doc. 78-3 Ex. 21 at doc.

postconviction proceedings. The ineffective assistance of trial counsel claims that he did raise in his postconviction motion were based on different instances of counsel's performance. (Doc. 30 Ex. 13 at 11-17)

A petitioner may not present a particular factual instance of ineffective assistance of counsel in a federal petition that he did not first present to the state court. *See McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005); *Johnson v. Singletary*, 162 F.3d 630, 634-35 (11th Cir. 1998). If a petitioner raises an ineffective assistance of counsel claim in state court but alleges different supporting facts in his federal petition, he has failed to fairly present the federal claim to the state court. *See Weeks v. Jones*, 26 F.3d 1030, 1044-46 (11th Cir. 1994) (rejecting the argument that "the general claim of ineffective assistance in state court preserves for federal review all alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court."). Since Harris cannot return to state court to file another postconviction motion raising the specific claim that trial counsel was ineffective for not raising *Brady* in a motion for mistrial, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris does not establish that an exception applies to overcome the default. *See id*. Accordingly, the ineffective assistance of trial counsel claim is barred from review.

---

pp. 158-165) Although the motion mentioned the OnStar records, it did not allege any *Brady* violation with respect to those records. (Doc. 78-3 Ex. 21 at doc. p. 164)

Notwithstanding the default and resulting bar,[19] Harris fails to show that trial counsel was ineffective for the reason alleged.  For the reasons addressed above and within the state court's order, there was no basis for counsel to raise a *Brady* issue based on the OnStar records or the recording device. Thus, Harris has not shown that the State withheld exculpatory with respect to any OnStar records or the contents of any recording device. Harris is not entitled to relief on Ground Three, Sub-Claim Four.

### C.   Sub-Claim Three: Ineffective Assistance of Appellate Counsel for not Raising *Brady* on Direct Appeal

Harris argues that appellate counsel was ineffective for not raising a *Brady* argument in connection with the recorder and OnStar records. Respondent concedes that Harris exhausted this claim in state court in his amended Rule 9.141 petition alleging ineffective assistance of appellate counsel. (Doc. 30 Ex. 27 at 13-14) The state appellate court denied the claim without discussion. (Doc. 30 Ex. 28)

Harris does not show that the state court unreasonably rejected his claim. Because Harris fails to show that the State withheld evidence that was favorable to him, he does not demonstrate that counsel performed deficiently in failing to raise a meritless claim or that he was prejudiced by counsel's performance. *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."). As Harris does

---

[19] Respondent does not address the lack of exhaustion and procedural default due to Harris's failure to raise this specific claim of ineffective assistance of trial counsel in the postconviction proceedings.

not show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, he is not entitled to relief on Ground Three, Sub-claim Three.

## IV.   Ground Four: Trial Court Error for Denying the Motion for Mistrial

Harris argues that the trial court erred in denying his motion for mistrial, resulting in a violation of his federal due process rights. As addressed, when Harris terminated his *pro se* representation mid-trial, the Office of the Public Defender was ultimately re-appointed. Counsel moved for a mistrial due to necessity, arguing that more time was needed to prepare an adequate defense. The state court denied the motion for mistrial (Doc. 30 Ex. 2 Vol. at 707-09):

> We are at this juncture of the trial because of no one's fault but Mr. Harris'. Mr. Harris exercised his right to proceed pro se. He gets to a point that he doesn't believe the trial is going as well as he wants it to go and now wants his original attorneys appointed and wants this court to declare a mistrial to have a second bite at the apple, if you will.
>
> Mr. Harris was explained in great detail the advantages of having an attorney represent him from the very beginning. He was also explained in great detail the disadvantages of representing himself and going forward with trial. It was explained to him in great detail prior to discharging you, [Assistant Public Defenders], why you wanted to waive his right to a speedy trial and not go forward, and he chose on his own to have this trial move in the fashion that it has, in fact, that we started on January 10th picking a jury.
>
> I have to consider whether or not I believe if I were to deny Mr. Harris' motion for mistrial whether or not he would - - any injustice would be served towards Mr. Harris. Clearly, if I were to deny the mistrial and require him to continue on, he wouldn't like it. But I don't believe it would be an injustice.

I think that this is a tactic that Mr. Harris is employing to delay justice. I think that the State would be prejudiced by this court declaring a mistrial, and I think that harm would come to the victim by having to go through this traumatic emotional ordeal all over again.

I don't believe that this was something that was unforeseen on Mr. Harris's part. I think that, quite frankly, I think that Mr. Harris is an intelligent individual. I think he might have outsmarted himself. As a result, I think that - - I think that this is a deliberate attempt on Mr. Harris's decision not to go to trial with the jury that he himself has picked, and he chose to go pro se. He chose to start this trial pro se. He chose to pick this jury pro se, and he's going to have to live with the consequences.

I think it would cause undue prejudice towards the State of Florida, and I don't think that granting a motion for mistrial would give the State of Florida a fair trial. And I think I have to weigh both sides, and I'm going to deny your motion for mistrial at this time.

However, the state court granted counsel's subsequent request for a continuance and recessed the proceedings from Thursday, January 13, 2011, to Tuesday, January 18, 2011. (Doc. 30 Ex. 2 Vol. V at 719-20)

When Harris argued on appeal that the state court erred in denying his motion for mistrial, he failed to exhaust the federal dimension of the claim. He only cited state law in support of the claim. (Doc. 30 Ex. 6 at 19-27) While Harris contended that the trial court's decision violated his rights to due process and a fair trial, he did not cite any federal authority or specifically refer to any federal constitutional right. (Doc. 30 Ex. 6 at 19-27) Because Harris did not provide the state appellate court with a clear indication that he intended to raise a federal claim, Harris failed to exhaust the federal claim presented in his habeas petition. *See Preston*, 785 F.3d at 458, 460. Harris's inability to return to state court to raise the federal claim in a second direct appeal leaves the claim procedurally defaulted. *See Smith*, 256 F.3d at 1138.

Apparently recognizing the lack of exhaustion, Harris appears to contend that he has shown cause to overcome the default because his appellate counsel was ineffective for failing to challenge the denial of the mistrial motion on federal grounds. An attorney's deficiency may constitute cause to overcome a procedural default if 'the assistance [was] so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). First, however, the petitioner must raise the allegation of ineffective assistance in state court. *See id*. at 451-52 ("[I]neffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim . . . [that must] be first raised in state court.") (emphasis in original).

None of Harris's Rule 9.141 petitions alleged that appellate counsel was ineffective for not challenging the denial of mistrial on federal grounds. (Doc. 30, Exs. 25, 27, 36) As Harris therefore failed to raise in state court the underlying allegation of ineffective assistance of counsel that, if proven, could have established cause for his default, he cannot overcome the procedural default through the cause and prejudice exception. Harris does not establish that the actual innocence exception applies to overcome the default. *See Smith*, 256 F.3d at 1138. As Harris fails to overcome the procedural default, Ground Four is barred from federal habeas review.


**V.    Ground Five**

### A.   Sub-Claim One: Trial Court Error for Failing to Appoint Conflict-Free Counsel and Sub-Claim Two: Trial Court Error for Failing to Inform Harris of his Right to Conflict-Free Counsel

Harris contends that the trial court violated his Sixth Amendment right to counsel when it failed to inform him of his right to conflict-free counsel and coerced him into accepting the Public Defender's reappointment in this case. Respondent argues that Harris's trial court error claims are unexhausted because Harris did not present them in state court. Harris did not bring these trial court error claims on direct appeal. (Doc. 30 Ex. 6) Accordingly, Harris's trial court error claims are unexhausted. Since state procedural rules preclude Harris's return to state court to raise the claim in a second direct appeal, the claims are procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris does not show that an exception applies to overcome the default. *See id*.

The Court notes that Harris brought a similar claim in his postconviction motion, alleging that he was coerced into accepting re-appointment of the Office of the Public Defender. The claim was not clear as to whether the trial court or Harris's counsel allegedly coerced him. To the extent that Harris's postconviction claim alleged coercion by the trial court, however, it is unexhausted because Harris did not allege that the trial court violated his federal rights. (Doc. 30 Ex 13 at 22-26) Harris cannot return to state court to exhaust a federal claim, and he does not show that an exception applies to overcome the resulting procedural default. *See Smith*, 256 F.3d at 1138. Accordingly, Harris's claim of trial court error is barred from federal habeas review and he cannot obtain relief on Ground Five, Sub-claims One and Two.

### B. Sub-Claim Three: Trial Court Error in Reweighing Facts

Harris contends that the court erred by "reweighing" previously developed facts at the January 13, 2011 hearing concerning the re-appointment of the Office of the Public Defender. (Doc. 43 at 20) As Respondent notes, this sub-claim raises no federal constitutional violation. Accordingly, it is not cognizable on federal habeas review. *See Branan*, 861 F.2d at 1508. Furthermore, even if the claim were construed as federal in nature, it is unexhausted because Harris did not raise it on direct appeal. (Doc. 30 Ex. 6) As Harris cannot return to state court to file a second direct appeal, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris fails to establish the applicability of an exception to overcome the default. *See id*. Harris is not entitled to relief on Ground Five, Sub-Claim Three.

### C.   Sub-Claim Four: Ineffective Assistance of Trial Counsel

Harris claims that trial counsel was ineffective for not informing him of his right to conflict-free counsel and coercing him into accepting reappointment of the Office of the Public Defender. As addressed above, Harris alleged in claim four of his postconviction motion that he was coerced into accepting the reappointment of the Public Defender. The claim was vague and did not specifically identify the basis as either trial court error or ineffective assistance of counsel. To the extent the claim of coercion was based on ineffective assistance of trial counsel, and to the extent Harris intends to raise the same claim here, he cannot obtain relief because he fails to show that the state court unreasonably denied his claim.

65

The state court found (Doc. 30 Ex. 21 at 79-83) (state court record citations

omitted) (emphasis in original):

> The crux of Defendant's allegation in claim four is that, upon his request for counsel during trial, he was coerced into appearing as though he wanted the Office of the Public Defender reappointed, not the Office of Regional Counsel and that, but for this coercion – the alleged promise that a mistrial would be granted if he were represented by the Office of the Public Defender rather than the Office of Regional Counsel – he would have kept regional counsel as his appointed counsel. The Court first notes that a person is bound by their statements made under oath, and that Florida courts have held that a defendant who attempts to go behind a sworn statement under the claim that he was coerced to make false statements to the court is precluded from post-conviction relief. *See e.g. Henry v. State*, 920 So. 2d 1245, 1246 (Fla. 5th DCA 2006) . . . ; *Iacono v. State*, 930 So. 2d 829, 830-31 (Fla. 4th DCA 2006) . . . Although *Henry* and *Iacono* are both in the context of plea colloquies, the Court notes that the rationale of those cases is applicable here, where Defendant is asserting that, but for the alleged coercion to make the false statements that he wanted to be represented by the Office of the Public Defender, he never would have asserted such. A review of the record, in context, refutes that claim, as it clearly reflects that Defendant did, in fact, want the Office of the Public Defender to be appointed in his case, not the Office of Regional Counsel. Specifically, . . . upon Defendant's assertion that his appointed regional counsel "couldn't possibly be prepared by tomorrow" and the court's inquiry as to whether Defendant was "asking that the public defender be appointed to your case?", Defendant's response was as follows:
>
>> They certainly have a six month head start on the case rather than Mr. Boldt, the two attorneys that represented me. There was no conflict between us. There was an issue about whether or not my speedy trial should be waived, but there was no specific conflict certified. There was a personality disagreement that took place probably 48 hours before Monday that should not have taken place which affected my judgment, probably more severe that in [sic] should have.
>>
>> I have no problems or objections or any conflict regarding Ms. Pavlidis or Mr. Traina as far as their legal expertise and

being able to litigate the trial. The issue was a waiver of not [sic] of my speedy trial, constitutional rights.

I fully understand and realize what the magnitude of what they were asking to do last Tuesday with regards to the waiver of speedy trial issue. And that was a tremendous error in judgment on my part, and I should have listened to Mr. Traina's advice, and I should have allowed Ms. Pavlidis to seek that continuance on Tuesday. And all I can say to the Court is that was a tremendous error of judgment on my part.

Additionally, the alleged coercion – according to Defendant's argument in claim four – occurred following the "off-the-record discussion" and recess "where Harris was instructed on how to respond to Judge Tharpe's forthcoming inquiry," both of which Defendant asserts occurred at p. 631 of the trial transcript.[20] The [c]ourt finds that the record undercuts the

---

[20] The cited portion of the trial transcript involved proceedings while the Office of Regional Conflict Counsel was representing Harris during the trial, after a DNA stipulation was read to the jury. After the court excused the jury for the day and the jurors left the courtroom, the following occurred (Doc. 30 Ex. 2 Vol. V at 631):

THE COURT: All right. I'm going to ask that counsel approach the bench. I'm going to ask [the Public Defender], would you approach the bench as well please[?]

(Whereupon, an off-the-record discussion ensued.)

THE COURT: All right. We're on.

Mr. Harris, given the fact that we now have entered into the stipulation, are you prepared along with Mr. Boldt as your attorney to continue with this trial tomorrow?

THE DEFENDANT: No, Judge.

THE COURT: Why?

THE DEFENDANT: Mr. Boldt couldn't possibly be prepared by tomorrow.

THE COURT: Okay. Are you going to be asking that the public defender be reappointed to your case?

credibility of this allegation on its face, as the trial court had made clear on the record *prior* to this bench conference and recess that he had great concerns in granting a motion for mistrial and that it was the court's belief that a denial of such a motion was within his right, regardless of who represented Defendant. In fact, the trial court had specifically advised Defendant upon his request for counsel that "that doesn't mean that if you ask for an attorney today and I grant you that right, that I'm going to allow a continuance of the trial. You may - - I may appoint an attorney to represent you and rather than declare a mistrial, I may require the attorney to proceed with your defense and we continue on." As Defendant was aware of the court's inclination prior to any alleged coercion, the Court finds Defendant to not be credible in his assertion that he was coerced to then request the Office of the Public Defender under the promise that doing so would result in a mistrial.

Also undercutting the credibility of Defendant's assertion that he was coerced to request the Office of the Public Defender is the transcript of the first day of Defendant's trial, wherein Defendant expressed his specific request to have Assistant Public Defender Maria Pavlidis as his appointed stand-by counsel: "Ms. Pavlidis has 90 percent knowledge of the circumstances and facts in this case. So in the interest of justice, she would be much better served as my assistance counsel than any other attorney. She has worked this case for the last five months."

Additionally, the Court notes that the credibility of Defendant's allegation is undercut further by the record where, subsequent to this alleged coercion, Defendant clearly asserted his want to have counsel appointed to represent him at trial and that he wanted the Office of the Public Defender, not the Office of Regional Counsel, to represent him, and that he specifically wanted his prior Assistant Public Defender reappointed. The record reflects that this assertion by Defendant was done with Defendant's clear acknowledgment that he was seeking reappointment of the Office of the Public Defender, but that there was no guarantee that such would be appointed, or, that, even if appointed, there was no guarantee as to whether a motion for mistrial and/or continuance would be granted. The record reflects further that Defendant then

---

THE DEFENDANT: They certainly have a six month head start on the case . . .

Harris then stated that his disagreement with the Office of the Public Defender was over whether to waive speedy trial, and that he now believed it was a mistake to have discharged the attorneys and proceeded *pro se*. (Doc. 30 Ex. 2 Vol. V at 631-32)

affirmed the court's inquiry about Judge Fuente's belief that there was no conflict between Defendant and the Office of the Public Defender and that, if there was a conflict, it has been waived, and that Defendant was specifically requesting that the court discharge regional counsel and appoint the Office of the Public Defender. The record reflects further that Defendant then affirmed the State making clear on the record that Defendant was specifically requesting the Office of the Public Defender and attorneys Traina and Pavlidis to be appointed instead of regional counsel. Accepting Defendant's statements to the court as true, the record refutes Defendant's assertion that he did not wish to have the Office of the Public Defender appointed in his case.

Finally, the Court finds that Defendant[ ] cannot demonstrate prejudice on this allegation. Specifically, Defendant alleges in claim four that, "but for the coercion perpetrated, there was no compelling reason for Harris to have 'specifically asked for the public defender to represent him instead of Mr. Boldt' [and] Harris would have continued with trial under self-representation and/or with Mr. Boldt as lead counsel, where he would have been acquitted or received a mistrial." In light of the record reflecting the trial court's inclination to deny a motion for mistrial regardless of who represented Defendant, the Court finds that there is not a reasonable probability the trial court would have granted a mistrial had Defendant continued to be represented by regional counsel and not made the allegedly-coerced-request for the Office of the Public Defender to be appointed. Defendant cannot show this alleged coercion had any effect on the court's ruling on a motion for mistrial. Further, the Court finds that Defendant's claim that he "would have been acquitted" but for the alleged coercion is entirely speculative.

Harris does not show that the state court unreasonably denied his claim. For the reasons set out by the state court, the record supports the conclusion that Harris was not coerced into accepting the Office of the Public Defender. Rather, he affirmatively indicated on the record that he wanted to proceed with the Office of the Public Defender and that he made a mistake in discharging that Office from representation prior to trial. Moreover, as the postconviction court's order points out, the trial court informed Harris that there was no assurance a motion for mistrial would

be granted, no matter which attorney(s) represented Harris. Any self-serving assertion about the off-the-record discussion is speculative, conclusory, and unsupported by any corroborating evidence. The assertion is also wholly contradictory to Harris's sworn statements at the hearing expressing his desire to have the Public Defender reappointed. Harris does not show that the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable factual determination.

Lastly, it appears that Harris also intends to raise the claims he brought in grounds 17 and 18 of his second supplement to his postconviction motion. There, he claimed that his attorney from the Office of Regional Conflict Counsel "thwarted declaration of a conflict and new trial" by not raising issues surrounding the conflict hearing and not objecting to the "invalid waiver of right to independent conflict-free counsel." (Doc. 30 Ex. 29 Attachment at 8) Harris also claimed that his attorneys from the Office of the Public Defender failed to raise an "invalid waiver of right" to conflict-free counsel as well as Judge Fuente's alleged failure to advise Harris of his "right to independent conflict free counsel" in arguing the motion for mistrial and motion for new trial. (Doc. 30 Ex. 29 Attachment at 9)

As the second supplement to his postconviction motion was not ruled upon by the court and appears to have been overlooked, this Court reviews the claim *de novo*. *See Williams*, 568 U.S. 289. However, Harris is not entitled to relief. First, his claim is vague and conclusory and fails to clearly explain how the attorneys' performance was deficient, or how he was prejudiced as a result. Speculation cannot form the basis of

ineffective assistance of counsel claim. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

Moreover, for the reasons addressed above, Harris fails to establish a constitutional violation due to alleged coercion or conflict with appointment or re-appointment of counsel that would have formed the basis of a motion for new trial or a motion for mistrial. To the contrary, Harris asked for and voluntarily accepted the re-appointment of the Office of the Public Defender. Judge Tharpe secured Judge Fuente's involvement for the specific purpose of determining whether a conflict would arise if the Office of the Public Defender were reappointed. As addressed earlier in this Order, Judge Fuente explained that the purpose of the hearing was "to simply make some findings to determine whether there, in fact, would be a conflict with [the Office of the Public Defender] representing the defendant". (Doc. 30 Ex. 46 at 6)

Harris insisted that he wanted to proceed with the Office of the Public Defender and Judge Fuente concluded that there was no barrier to reappointing that Office. Thus, the state court in fact found that there was no conflict.

Under these circumstances, Harris establishes neither deficient performance nor a reasonable probability that the outcome of the proceeding would have been different if he had been advised of the right to conflict-free counsel or if counsel had argued as Harris proposes in moving for a mistrial or a new trial. Accordingly, Harris fails to meet his burden to establish both prongs of *Strickland*.

**C.**     **Sub-Claim Five: Ineffective Assistance of Appellate Counsel for not Moving to Supplement the Record With a Transcript of the Hearing on Appointment of Counsel and Present Argument About the Hearing**

Harris contends that appellate counsel was ineffective for failing to supplement the record on appeal with a transcript of the January 13, 2011 hearing concerning the potential re-appointment of the Office of the Public Defender and for failing to raise issues concerning the appointment of conflict-free counsel. Harris contends that the transcript was not included in the record on appeal because it was sealed. It appears that the hearing was closed because it might have revealed privileged attorney-client matters.

Harris raised this claim of ineffective assistance of appellate counsel in his amended Rule 9.141 petition and Respondent concedes that it is exhausted for federal habeas purposes. (Doc. 30 Ex. 27 at 4-9) However, Harris does not show that the state appellate court unreasonably denied his claim, as the record demonstrates that there were no circumstances that would give rise to a viable claim that Harris's constitutional rights were violated as a result of that proceeding. Therefore, Harris has not shown that appellate counsel performed deficiently, or that he was prejudiced by counsel's performance.[21]

Harris fails to establish that the state appellate court's denial of his ineffective assistance of appellate counsel claim involved an unreasonable application of

---

[21] Harris does not allege that appellate counsel was unaware of the transcript or had no access to it in preparing the appeal.

*Strickland*. Nor does he show that the state appellate court's decision was based on an unreasonable factual determination. Accordingly, Harris is not entitled to relief on Ground Five, Sub-claim Five.

## VI.   Ground Six

### A.   Sub-Claim One: Inadequate *Faretta* Inquiry; Sub-Claim Two: Incompetency to Waive Right to Counsel; and Sub-Claim Three: Ineffective Assistance of Appellate Counsel

Harris argues that the trial court conducted an inadequate hearing under *Faretta v. California*, 422 U.S. 806 (1975), to determine the validity of his waiver of his right to counsel. Specifically, Harris claims that (1) he was not informed of the mandatory life sentence he faced as a prison releasee reoffender and (2) the effects of his medication rendered him incompetent to waive his right to counsel. Harris contends that his waiver of counsel was therefore unknowing and involuntary.

Harris's claim of trial court error under *Faretta* is unexhausted because Harris did not raise it on direct appeal. (Doc. 30 Ex. 6) As state procedural rules preclude Harris from returning to state court to raise the claim in a second direct appeal, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris does not establish that the fundamental miscarriage of justice exception applies to overcome the default.

Harris appears to argue that the default should be excused under the cause and prejudice exception because his appellate counsel was ineffective for not raising the *Faretta* claim. Harris presented this claim of ineffective assistance of appellate counsel

in his amended Rule 9.141 state habeas petition. (Doc. 30 Ex. 27 at 10-12) The petition was denied without discussion. (Doc. 30 Ex. 28) Counsel's ineffective assistance may amount to cause to overcome a procedural default. *Edwards*, 529 U.S. at 451. If a petitioner cannot establish the independent ineffective assistance of counsel claim, however, he cannot prevail on an argument that such ineffective assistance caused the procedural default. *Id*. at 451-52.

Harris fails to show that his appellate counsel was constitutionally ineffective for not raising the *Faretta* claim. The Sixth Amendment affords a criminal defendant the right to represent himself. *Faretta*, 422 U.S. at 819-20. "[I]n order to represent himself, the accused must 'knowingly and intelligently' forgo" the benefits associated with the right to counsel. *Id*. at 835. Accordingly, to satisfy *Faretta* and ensure that the defendant's choice to proceed *pro se* is knowingly and voluntarily made, the defendant must clearly and unequivocally assert his right to self-representation, and the court must conduct a hearing to confirm that the defendant understands the disadvantages of self-representation. *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1064-65 (11th Cir. 1986).

The trial court conducted a lengthy and thorough inquiry, informing Harris of the advantages of proceeding with an attorney and the dangers and disadvantages of representing himself. (Doc. 30 Ex. 44 at 12-31)[22] The court and prosecutor addressed

---

[22] The trial court informed Harris of the many advantages of continuing with an attorney, including, for instance, that an attorney: might uncover potential violations of constitutional rights and take measures to address them; might identify and secure favorable evidence; would have experience and knowledge of legal process, jury selection, evidentiary matters,

the penalties Harris faced if convicted as charged, including a mandatory life sentence. (Doc. 30 Ex. 44 at 20-24) Harris understood that he was facing a life sentence. (Doc. 30 Ex. 44 at 23-24) While Harris stated that he was "a little confused on the Habitual Felony Offender," after the prosecutor clarified that Habitual Felony Offender sentencing was discretionary, Harris stated, "All right. I think that answered my questions, Judge." (Doc. 30 Ex. 44 at 27-28) Later, the court again stated that Harris faced life in prison. (Doc. 30 Ex. 44 at 36) Harris clearly and unequivocally stated that he wished to proceed *pro se*. (Doc. 30 Ex. 44 at 29-30) The state court found that Harris was competent to waive counsel and that his waiver was knowingly, intelligently, and freely made. (Doc. 30 Ex. 44 at 35)

Harris does not show that appellate counsel was ineffective in failing to challenge the sufficiency of the *Faretta* proceeding for the identified reasons. When Harris was informed that kidnapping was a first degree felony, and that he faced a

---

and jury instructions; would argue in his defense, including by presenting a closing argument; would call witnesses and present evidence on his behalf; would advise him whether to testify on his own behalf; might prevent improper argument by the State; might make sure any errors are preserved for appeal; and would assist in preparing for sentencing if he was convicted. (Doc. 30 Ex. 44 at 12-16) The trial court also informed Harris that counsel was asking for more time to investigate DNA issues, and that counsel may be able to develop other witnesses such as DNA experts, review notes of the Florida Department of Law Enforcement, and potentially develop a defense if they waived speedy trial. (Doc. 30 Ex. 44 at 13-14) The trial court warned Harris of disadvantages of representing himself, including: he would not receive special treatment from the court; he would be limited to legal resources available to him in the jail; he would be required to abide by the same rules of evidence and procedure as attorneys; he would have limited access to the prosecutor; the State would not treat him with leniency; and if he was convicted, he would not be able to claim that his lack of legal knowledge or skill is a basis for a new trial. (Doc. 30 Ex. 44 at 16-19)

mandatory life sentence as a prison releasee reoffender upon conviction of a first degree felony, he stated that he understood. (Doc. 30 Ex. 44 at 20-27)

Further, the record contains no indication that Harris was incompetent to waive his right to counsel. A criminal defendant may not waive his right to counsel "unless he does so 'competently and intelligently.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938)). The standard for competence to waive the right to counsel is no higher than the standard for competence to proceed to trial. *See Id.* at 398-99. That standard, set out in *Dusky v. United States*, 362 U.S. 402 (1960), is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him."

No part of the record indicates that the effects of Harris's medication rendered him incompetent for purposes of making a waiver. When the trial court asked Harris whether he was under the influence of any drugs or alcohol, Harris stated that he was not. (Doc. 30 Ex. 44 at 28) Harris later told the court that he wanted to re-address that question and disclosed that he took prescription medications. (Doc. 30 Ex. 44 at 31) Harris listed his medications and said that that morning he had taken an anti-depressant medication, an anti-anxiety medication, and a muscle relaxant. (Doc. 30 Ex. 44 at 34) Harris assured the court that he had no difficulty understanding the proceedings. (Doc. 30 Ex. 44 at 34-35)[23] Further, a review of the hearing transcript

---

[23] After Harris detailed the medications he had taken that day, the court inquired (Doc. 30 Ex. 44 at 34-35):

shows that Harris participated in the proceeding, answered the trial court's questions logically and appropriately, and stated that he understood the issues addressed and the information presented at the hearing. (Doc. 30 Ex. 44)

Thus, the record would not have alerted appellate counsel to a potential *Faretta* claim. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)); *see also Johnson v. Alabama*, 256 F.3d 1156, 1188 (11th Cir. 2001) ("It is difficult to win a *Strickland* claim on the grounds that appellate counsel presented the wrong legal arguments where the arguments actually pursued were reasonable in the circumstances. . . . [C]ounsel must be 'highly selective about the issues to be argued on appeal.'" (quoting *United States v. Battle*, 163 F.3d 1, 1 (11th Cir. 1998))).

---

THE COURT: Okay. And as we stand here today, are you having any difficulty whatsoever understanding what's going on in court?

THE DEFENDANT: No, Judge.

THE COURT: The medications that you've taken have not had any effect with regard to your ability to understand what's going on in court?

THE DEFENDANT: No, sir.

THE COURT: Okay. Do you have any other questions before I make my determination, sir?

THE DEFENDANT: No, because I guess these - - these requests would be probably after you make your determination.

Appellate counsel may choose to focus on the strongest claims while excluding claims that might have a lower chance of success or detract from stronger arguments. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983); *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[I]t is difficult to demonstrate that counsel was incompetent [for not raising a particular claim because] . . . 'only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986))). Harris does not show that appellate counsel was ineffective for not bringing a *Faretta* claim. Thus, Harris fails to establish any ineffective assistance by his appellate counsel that would constitute cause to overcome the procedural default of his *Faretta* claim.

Accordingly, Harris's claim that the *Faretta* inquiry was inadequate and that he was incompetent to waive his right to counsel are barred from federal habeas review. To the extent he intends to raise an independent claim that appellate counsel was ineffective for not raising these claims on appeal, he fails to show that the state appellate court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim for the same reasons addressed above. Harris is not entitled to relief on Ground Six, Sub-claims One, Two, or Three.

### B.     Sub-Claim Four: Ineffective Assistance of Trial Counsel

Harris states that he claimed in his second supplement to his postconviction motion that trial counsel was ineffective in not raising "the *Faretta* deficiencies" as

grounds for a mistrial and new trial.[24] In his postconviction motion, Harris claimed that counsel was ineffective because prior to being discharged, counsel should have informed the court of Harris's mental health concerns and prior suicide attempts; investigated effects of his medications, obtained a mental health expert; and objected to the *Faretta* proceeding.

To the extent Harris intends to raise the same claim of ineffective assistance of trial counsel in his federal habeas petition, he cannot obtain relief. The state court denied this claim (Doc. 30 Ex. 21 at 50-51) (state court record citations omitted):

> Defendant's allegation is that his original appointed counsel, prior to being discharged, had an obligation to advise the court of Defendant's mental health issues including his suicide attempts and should have investigated the effects of Defendant's medications and obtained a mental health expert. Defendant contends further that counsel should have objected to the *Faretta* hearing and to the court allowing Defendant to proceed *pro se*. The Court notes, that mental illness, prior suicide attempts, and medications do not necessarily equate to incompetency, and that, where nothing in the record creates any legitimate doubt as to competency or provides any reasonable grounds for counsel to doubt competency, claims relating to counsel's alleged deficiencies concerning a defendant's alleged incompetency will warrant no relief. *See Barnes v. State*, 124 So.3d 904 (Fla. 2013). In Defendant's case, a review of the record reflects that, upon Defendant's request to proceed *pro se* wherein Defendant put on the record the specific reasons for his decision, and the trial court conducted an extensive *Faretta* hearing, during which Defendant participated fully, asked and answered questions appropriately, listed the medications he was taking at that time, and advised the court that those medications did not alter his ability to

---

[24] In the motion for new trial, the Office of the Public Defender argued: the trial court erred in granting the State's motion in limine; the trial court erred in denying the motion for a mistrial; the trial court erred in denying Harris's motion in limine concerning his friend Michael Sexton's testimony; the trial court erred in denying Harris's motion for judgment of acquittal; the trial court erred in not timely arraigning Harris on the amended information; and the trial court erred in allowing the State to present redacted audio and video recorded interviews of Harris. (Doc. 78-3 Ex. 21 Part 1 at doc. pp. 177-85)

understand what was going on in court. The court then made a specific finding that Defendant was competent to waive counsel and found that his waiver was done knowingly, intelligently, and freely. The record is clear in this case that Defendant wanted to represent himself solely because he disagreed with his appointed counsel's strategic decision to waive speedy trial and request a continuance; there is nothing in the record to support that Defendant's competence to waive counsel was in doubt. Additionally, the credibility of Defendant's claim is severely undercut by the January 13, 2011, proceeding before Judge Fuente, at which Defendant made no reference to nor demonstrated any competency concerns, and again reiterated his decision to proceed *pro se* in this case at that time based on his appointed counsel's want to waive speedy trial. As the record does not support Defendant's assertion that he was incompetent to waive counsel, the Court finds that counsel cannot be deemed deficient for failing to have investigated and raised competency issues with the court as alleged, nor can Defendant demonstrate prejudice as a result of this alleged deficiency. Additionally, the record does not support that the court's finding at the *Faretta* hearing warranted an objection by counsel as alleged, nor can Defendant demonstrate any prejudice as a result of this alleged deficiency. Moreover, the record reflects that Defendant waived his right to seek post-conviction relief on an allegation of ineffective assistance of counsel relating to his representation by the Office of the Public Defender during this time. Under these circumstances and in light of the record, Defendant warrants no relief on his allegations of ineffective assistance of counsel in claim one.

Harris does not meet his burden of showing that the state court unreasonably denied this claim. For the reasons set forth in the state court's order and addressed above, the record contains no indication that Harris was incompetent to waive his right to counsel at the time of the *Faretta* hearing. Additionally, as the state court noted, concerns about a defendant's mental health are not always commensurate with incompetency. *See, e.g., Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or

understand the charges.") (citation omitted); *see also Drope v. Missouri*, 420 U.S. 162, 180-81 (1975) (a suicide attempt may indicate mental instability but does not necessarily signal incompetency to stand trial); *Sheley v. Singletary*, 955 F.2d 1434, 1438-39 (11th Cir. 1992) (a defendant's use of psychiatric drugs is relevant but not determinative to establishing competency). Harris does not establish that trial counsel was ineffective for the reasons alleged. Harris fails to show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his ineffective assistance claim.

This Court notes that in his second supplement to his postconviction motion, Harris again alleged ineffective assistance of counsel for failing to alert the trial court that the *Faretta* inquiry was deficient due to Harris's mental condition and alleged incompetency to waive his right to counsel. (Doc. 30 Ex. 29 Attachment at 8-9) This claim, as presented in the second supplement to Harris's postconviction motion, is entitled to *de novo* review because the state court apparently overlooked it. *See Williams*, 568 U.S. 289. However, for the same reasons addressed by the state court in ruling on the claim as presented in his first amended postconviction motion and as addressed above, Harris fails to show that counsel had a basis to challenge the validity of the *Faretta* hearing as defective due to Harris's mental state or incompetency to waive his right to counsel. Counsel is not ineffective for declining to raise a meritless claim. *See Bolender*, 16 F.3d at 1573. Harris fails to show either prong of *Strickland*.

Finally, within Ground Six, Harris states that he "raised the substantive psychoactive medications issue in his first postconviction motion." To the extent

Harris attempts to raise an independent substantive federal due process competency claim, he cannot obtain relief. In ground one of his postconviction motion, Harris alleged that he was incompetent to waive his right to counsel. (Doc. 30 Ex. 13 at 5-6) But Harris did not specifically allege a violation of his federal rights, thereby failing to exhaust the federal nature of the claim. (Doc. 30 Ex. 13 at 5-6) However, a substantive due process competency claim generally cannot be defaulted. *See Wright v. Sec'y, Dep't of Corr.*, 278 F.3d 1245, 1258-59 (11th Cir. 2002) ("The district court's ruling that Wright had procedurally defaulted his substantive due process mental competency claim is contrary to the law of this circuit that such claims generally cannot be defaulted."). Harris fails to establish that he was incompetent to proceed to trial because he fails to show that he lacked "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him" at the time of trial. *Dusky*, 362 U.S. 402. Therefore, Harris fails to show that his federal constitutional rights were violated when the criminal proceeding against him was conducted. Harris is not entitled to relief on Ground Six.

## VII.   Ground Seven

### A     Sub-Claim One: Trial Court Error for Granting State's Motion in Limine

Harris contends that the trial court erred when it granted the State's motion *in limine* to exclude information about the victim's "four prior DUI arrests and prior

contact with law enforcement." (Doc. 43 at 23) Harris unsuccessfully argued this motion *pro se* prior to the start of trial. (Doc. 30 Ex. 2 Vol. I at 28-29) When counsel was appointed mid-trial, the court permitted counsel to present additional argument. (Doc. 30 Ex. 2 Vol. VI at 732-34) In particular, counsel stated that J.A.'s deposition indicated that she had been in a patrol car before and understood the procedures in a normal traffic stop. (Doc. 30 Ex. 2 Vol. VI at 733) The state court denied counsel's request to reconsider the evidentiary ruling excluding the evidence, concluding that it was not relevant or admissible. (Doc. 30 Ex. 2 Vol. VI at 732-34) Harris alleges that the trial court's decision resulted in violations of his federal rights to due process and a fair trial.

As Respondent correctly contends, Harris's federal claim on this ground is unexhausted. On direct appeal, Harris did not raise any federal claim in challenging the trial court's order granting the State's motion *in limine*. (Doc. 30 Ex. 6 at 48-49) Rather, he raised the claim solely in terms of state law. (Doc. 30 Ex. 6 at 48-49) Harris's generalized reference to a denial of his rights to "due process" and "a fair trial" did not suffice to raise a federal claim. *See Baldwin*, 541 U.S. at 32; *Lucas*, 682 F.3d at 1352; *Preston*, 785 F.3d at 458. As Harris cannot return to state court to present the federal claim in a second appeal, it is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Harris has not established the applicability of the fundamental miscarriage of justice exception.

To the extent Harris contends that he has shown cause to overcome the default because his appellate counsel was ineffective in not federalizing the claim on direct

appeal, that claim is unexhausted because Harris did not present it in a state habeas petition alleging ineffective assistance of appellate counsel. (Doc. 30 Exs. 25, 27, 36) Because the ineffective assistance of appellate counsel claim is unexhausted, it cannot constitute cause to overcome the default of the federal due process claim related to the exclusion of the victim's prior history. *See Edwards* 529 U.S. at 451-52. As Harris therefore does not establish the cause and prejudice exception to overcome the default, Ground Seven, Sub-claim One is barred from federal habeas review.

### B.   Sub-Claim Two: Ineffective Assistance of Trial Counsel Regarding the Motion in Limine

Within Ground Seven, Harris appears to contend that trial counsel was ineffective for presenting an inadequate response to the State's motion in limine. Counsel argued that the trial court should permit introduction of the evidence because the victim's knowledge of traffic stops and police vehicles undercut her testimony that she initially believed Harris to be a police officer effectuating a traffic stop. (Doc. 30 Ex. 2 Vol. VI at 732-34) In his postconviction motion, Harris contended that counsel should have emphasized that the victim's conduct in this case was "identical" to her pattern of conduct in earlier instances. Harris argued that the trial court would have allowed introduction of the evidence had counsel made this argument.

The state court rejected Harris's ineffective assistance claim. The state court's order explained in detail that counsel challenged the evidentiary ruling during the trial

and later cited the ruling as a basis for a new trial. (Doc. 30 Ex. 21 at 113-17) The state court concluded that Harris was not entitled to relief (Doc. 30 Ex. 21 at 117):

> The Court finds that counsel reasonably and repeatedly argued this issue to the court, and cannot be deemed deficient under these circumstances in light of the record. Moreover, this Court does not find there to be a reasonable probability that additional argument alleged by Defendant in this claim—that the accuser's criminal history "established an identical pattern of conduct; provided a motive to fabricate the allegations; and was relevant to establish a motive to lie and support proof of Harris' defense of consent"—would have affected the court's ruling on this issue and would not have changed the outcome of Defendant's trial. For these reasons, the Court finds that counsel cannot be deemed deficient as alleged nor can Defendant demonstrate prejudice as a result of counsel's alleged deficiency, and Defendant warrants no relief on this allegation.

Harris fails to show that the state court unreasonably rejected his claim. The state court's ruling rests on an underlying question of state law: whether the argument proposed by Harris would have compelled introduction of the evidence at a state court trial under state evidentiary law. This Court must defer to the state court's decision that such evidence would have been ruled inadmissible even if counsel argued as Harris suggests. *See Pinkney*, 876 F.3d at 1295; *Callahan*, 427 F.3d at 932.

Under these circumstances, Harris does not show that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. Harris is not entitled to relief on Ground Seven.

## VIII.  Ground Eight

Harris argues that the state court erred in not addressing the claims presented in his second supplement to his postconviction motion and addressing several of his

postconviction pleadings together in one order. Harris cites Article 1, Section 9 of the United States Constitution, as well as the Fifth and Fourteenth Amendments, as bases for this contention, claiming that the state court violated his right to due process.  An alleged procedural defect in a state postconviction proceeding is not a basis for federal habeas relief because it does not concern the validity of the conviction. *See Carroll*, 574 F.3d at 1365 ("[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment–*i.e.,* the conviction itself–and thus habeas relief is not an appropriate remedy."); *Quince v. Crosby*, 360 F.3d 1259, 12662 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief." (citing *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987))). Ground Eight does not warrant federal habeas relief.

Accordingly, it is **ORDERED** that Harris's amended petition (Doc. 43) is **DENIED**. The **CLERK** is directed to enter judgment against Harris and to **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY
## AND
## LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

**IT IS FURTHER ORDERED** that Harris is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S. § 2253(c)(1). Rather, a court must first issue a certificate of appealability. Section 2253(c)(2) limits the issuing of a

certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Harris must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001). Because he fails to make this showing, Harris is not entitled to a certificate of appealability. Therefore, he is not entitled to appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to proceed *in forma pauperis* on appeal is **DENIED**. Harris must obtain permission from the circuit court to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on this 16th day of November, 2021.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE